352 F.3d 695
 Jose PADILLA, Donna R. Newman, as Next Friend of Jose Padilla, Petitioner-Appellee-Cross-Appellant,
v.
Donald RUMSFELD, Respondent-Appellant-Cross-Appellee.
 Docket No. 03-2235(L).
 Docket No. 03-2438(CON.).
 United States Court of Appeals, Second Circuit.
 Argued: November 17, 2003.
 Decided: December 18, 2003.
 
 COPYRIGHT MATERIAL OMITTED Paul D. Clement, Deputy Solicitor General, Washington, D.C. (David B. Salmons, Sri Srinivasan, Assistants to the Solicitor General, Jonathan L. Marcus, Attorney, Department of Justice, Washington, D.C., James B. Comey, United States Attorney for the Southern District of New York, Eric B. Bruce, Christine H. Chung, Assistant United States Attorneys, New York, NY, on the brief), for Respondent-Appellant-Cross-Appellee.
 Donna R. Newman, Andrew G. Patel, New York, NY, for Petitioner-Appellee-Cross-Appellant.
 Jenny S. Martinez, Stanford, CA; David W. DeBruin, Donald B. Verrilli, Jr., Sharon M. McGowan, Jenner & Block LLC, Washington, D.C., for Amici Curiae Hon. John J. Gibbons, Hon. Nathaniel R. Jones, Hon. Abner J. Mikva, Hon. William A. Norris, Hon. H. Lee Sarokin, Hon. Harold R. Tyler, Jr., Donald Francis Donovan, Scott Greathead, Robert E. Juceam, Philip Allen Lacovara, Robert Todd Lang, Robert M. Pennoyer, Barbara Paul Robinson, and William D. Zabel in support of Petitioner.
 Alfred P. Carlton, Jr., American Bar Association; John Payton, Seth P. Waxman, Paul R.Q. Wolfson, Kate Hutchins, Jonathan H. Siegelbaum, Jerrod C. Patterson, Chicago, IL, for Amicus Curiae American Bar Association in support of Petitioner.
 Steven R. Shapiro, American Civil Liberties Union Foundation; Arthur N. Eisenberg, New York Civil Liberties Union Foundation; Lucas Guttentag, Robin L. Goldfaden, Jonathan L. Hafetz, American Civil Liberties Union Foundation Immigrants' Rights Project, New York, NY, for Amici Curiae American Civil Liberties Union and New York Civil Liberties Union in support of Petitioner.
 Benito Romano, Joseph G. Davis, Mary Eaton, Willkie Farr & Gallagher, New York, NY, for Amicus Curiae Association of the Bar of the City of New York in support of Petitioner.
 Jonathan M. Freiman, Lawyers Committee for Human Rights, New Haven, CT; Wiggin & Dana LLP, New Haven, CT, for Amici Curiae The Cato Institute, The Center for National Security Studies, The Constitution Project, The Lawyers Committee for Human Rights, People for the American Way, and The Rutherford Institute in support of Petitioner.
 Barbara J. Olshansky, Jules Lobel, Michael Ratner, Shayana Kadidal, Nancy Chang, Jennifer Green, Center for Constitutional Rights, New York, N.Y. for Amici Curiae Center for Constitutional Rights, Asian American Legal Defense and Education Fund, Center for Human Rights & Constitutional Law, National Lawyers Guild, National Immigration Project of the National Lawyers Guild, National Lawyers Guild/Maurice & Jane Sugar Law Center for Economic & Social Justice, Unitarian Universalist Service Committee, et al. in support of Petitioner.
 Allison Marston Danner, Nashville, TN, for Amici Curiae Experts on the Law of War in support of Petitioner.
 Wallace A. Showman LLP, New York, NY, for Amici Curiae Law Professors in support of Petitioner.
 Joshua L. Dratel, Joshua L. Dratel, P.C., New York, NY; Donald G. Rehkopf, Jr., Law Office of Brenna & Brenna, Rochester, NY, for Amici Curiae National Association of Criminal Defense Lawyers and New York State Association of Criminal Defense Lawyers in support of Petitioner.
 Edward M. Shaw, New York Council of Defense Lawyers; Richard A. Greenberg, New York Council of Defense Lawyers, New York, NY, for Amicus Curiae The New York Council of Defense Lawyers in support of Petitioner.
 James W. Klein, Giovanna Shay, Timothy P. O'Toole, Public Defender Service, Washington, D.C., for Amicus Curiae Public Defender Service for the District of Columbia in support of Petitioner.
 Rachel H. Wolkenstein, Paul Cooperstein, New York, NY, for Amici Curiae Spartacist League and Partisan Defense Committee in support of Petitioner.
 Daniel J. Popeo, Richard A. Samp, Washington Legal Foundation, Washington, D.C., for Amici Curiae Washington Legal Foundation, Allied Educational Foundation, and U.S. Representatives Walter Jones, Lamar Smith, and John Sweeney in support of Respondent.
 Before: POOLER, B.D. PARKER and WESLEY, Circuit Judges.
 Judge WESLEY dissents in part in a separate opinion.
 INTRODUCTION
 POOLER and B.D. PARKER, Jr., Circuit Judges.
 
 
 1
 This habeas corpus appeal requires us to consider a series of questions raised by Secretary of Defense Donald Rumsfeld and by Donna R. Newman, Esq., on behalf of Jose Padilla, an American citizen held by military authorities as an enemy combatant. Padilla is suspected of being associated with al Qaeda and planning terrorist attacks in this country. The order was raising these questions was certified by the United States District Court for the Southern District of New York (Michael B. Mukasey, C.J.) and involve, among others: whether the Secretary of Defense is Padilla's "custodian" for habeas purposes, whether the Southern District of New York had jurisdiction over the petition, and whether the President has the authority to detain Padilla as an enemy combatant. We conclude that the Secretary of Defense is a proper respondent and that the District Court had jurisdiction. We also conclude that Padilla's detention was not authorized by Congress, and absent such authorization, the President does not have the power under Article II of the Constitution to detain as an enemy combatant an American citizen seized on American soil outside a zone of combat.
 
 
 2
 As this Court sits only a short distance from where the World Trade Center once stood, we are as keenly aware as anyone of the threat al Qaeda poses to our country and of the responsibilities the President and law enforcement officials bear for protecting the nation. But presidential authority does not exist in a vacuum, and this case involves not whether those responsibilities should be aggressively pursued, but whether the President is obligated, in the circumstances presented here, to share them with Congress.
 
 
 3
 Where, as here, the President's power as Commander-in-Chief of the armed forces and the domestic rule of law intersect, we conclude that clear congressional authorization is required for detentions of American citizens on American soil because 18 U.S.C. § 4001(a) (2000) (the "Non-Detention Act") prohibits such detentions absent specific congressional authorization. Congress's Authorization for Use of Military Force Joint Resolution, Pub.L. No. 107-40, 115 Stat. 224 (2001) ("Joint Resolution"), passed shortly after the attacks of September 11, 2001, is not such an authorization, and no exception to section 4001(a) otherwise exists. In light of this express prohibition, the government must undertake to show that Padilla's detention can nonetheless be grounded in the President's inherent constitutional powers. See Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 637-38, 72 S.Ct. 863, 96 L.Ed. 1153 (Jackson, J., concurring). We conclude that it has not made this showing. In reaching this conclusion, we do not address the detention of an American citizen seized within a zone of combat in Afghanistan, such as the court confronted in Hamdi v. Rumsfeld, 316 F.3d 450 (4th Cir.2003) ("Hamdi III"). Nor do we express any opinion as to the hypothetical situation of a congressionally authorized detention of an American citizen.
 
 
 4
 Accordingly, we remand to the District Court with instructions to issue a writ of habeas corpus directing Secretary Rumsfeld to release Padilla from military custody within 30 days, at which point the government can act within its legislatively conferred authority. For example, Padilla can be transferred to the appropriate civilian authorities who can bring criminal charges against him. If appropriate, he can also be held as a material witness in connection with grand jury proceedings. See United States v. Awadallah, 349 F.3d 42 (2d Cir.2003). Under any scenario, Padilla will be entitled to the constitutional protections extended to other citizens.[1]
 
 BACKGROUND
 I. The Initial Detention
 
 5
 On May 8, 2002, Jose Padilla, an American citizen, flew on his American passport from Pakistan, via Switzerland, to Chicago's O'Hare International Airport. There he was arrested by FBI agents pursuant to a material witness warrant issued by the Chief Judge of the Southern District of New York in connection with a grand jury investigation of the terrorist attacks of September 11. Padilla carried no weapons or explosives.[2]
 
 
 6
 The agents brought Padilla to New York where he was held as a civilian material witness in the maximum security wing of the Metropolitan Correctional Center (MCC). At that point, Padilla was under the control of the Bureau of Prisons and the United States Marshal Service. Any immediate threat he posed to national security had effectively been neutralized. On May 15, 2002, he appeared before Chief Judge Mukasey, who appointed Donna R. Newman, Esq., to represent Padilla. Newman "conferred with [Padilla] over a period of weeks in ... an effort to end [his] confinement." Padilla ex rel. Newman v. Bush, 233 F.Supp.2d 564, 576 (S.D.N.Y.2002) ("Padilla I"). She also conferred with Padilla's relatives and with government representatives on Padilla's behalf.
 
 
 7
 On May 22, Newman moved to vacate the material witness warrant. By June 7, the motion had been submitted for decision. A conference on the motion was scheduled for June 11. However, on June 9, the government notified the court ex parte that (1) it wished to withdraw its subpoena and (2) the President had issued an Order (the "June 9 Order") designating Padilla as an enemy combatant and directing Secretary Rumsfeld to detain him. Chief Judge Mukasey vacated the warrant, and Padilla was taken into custody by Department of Defense (DOD) personnel and transported from New York to the high-security Consolidated Naval Brig in Charleston, South Carolina. At the scheduled June 11 conference, Newman, unable to secure Padilla's signature on a habeas corpus petition, nonetheless filed one on his behalf as "next friend."
 
 
 8
 For the past eighteen months, Padilla has been held in the Brig in Charleston. He has not been permitted any contact with his counsel, his family or any other non-military personnel. During this period he has been the subject of ongoing questioning regarding the al Qaeda network and its terrorist activities in an effort to obtain intelligence.
 
 II. The Order Authorizing the Detention
 
 9
 In his June 9 Order, the President directed Secretary Rumsfeld to detain Padilla based on findings that Padilla was an enemy combatant who (1) was "closely associated with al Qaeda, an international terrorist organization with which the United States is at war"; (2) had engaged in "war-like acts, including conduct in preparation for acts of international terrorism" against the United States; (3) had intelligence that could assist the United States to ward off future terrorist attacks; and (4) was a continuing threat to United States security. As authority for the detention, the President relied on "the Constitution and ... the laws of the United States, including the [Joint Resolution]."[3]
 
 
 10
 In an unsealed declaration submitted to the District Court, Michael H. Mobbs, a special advisor to the Under Secretary of Defense for Policy (who claims no direct knowledge of Padilla's actions or of the interrogations that produced the information discussed in his declaration), set forth the information the President received before he designated Padilla as an enemy combatant. According to the declaration, Padilla was born in New York, was convicted of murder in 1983, and remained incarcerated until his eighteenth birthday. In 1991, he was convicted on a handgun charge and again sent to prison. He moved to Egypt in 1998 and traveled to several countries in the Middle East and Southwest Asia between 1999 and 2000. During this period, he was closely associated with known members and leaders of al Qaeda. While in Afghanistan in 2001, Padilla became involved with a plan to build and detonate a "dirty bomb" within the United States, and went to Pakistan to receive training on explosives from al Qaeda operatives. There he was instructed by senior al Qaeda officials to return to the United States to conduct reconnaissance and/or other attacks on behalf of al Qaeda. He then traveled to Chicago, where he was arrested upon arrival on May 8, 2002. Notwithstanding Padilla's extensive contacts with al Qaeda members and his actions under their direction, the government does not allege that Padilla was a member of al Qaeda.
 
 
 11
 The government also offered for the District Court's review Mobbs' sealed declaration, which the District Court characterized as "identifying one or more of the sources referred to only in cryptic terms in the [unsealed] Mobbs Declaration" and "set[ting] forth objective circumstantial evidence that corroborates the factual allegations in the [unsealed] Mobbs Declaration." Padilla I, 233 F.Supp.2d at 609.[4]
 
 
 12
 III. District Court Proceedings on the Habeas Petition
 
 
 13
 On June 26, 2002, the government moved to dismiss Padilla's habeas petition on the grounds that Newman lacked standing to act as Padilla's next friend, that Secretary Rumsfeld was not a proper respondent, and that, in any event, the District Court lacked personal jurisdiction over him. On the merits, the government contended that each Mobbs declaration contained sufficient evidence of Padilla's association with al Qaeda and his intention to engage in terrorist acts in this country on behalf of al Qaeda to establish the legality of holding Padilla in military custody as an enemy combatant. Padilla contended that the President lacked authority to detain an American citizen taken into custody in the United States. At a minimum, he sought access to counsel.
 
 
 14
 In a comprehensive and thorough opinion, the District Court determined that (1) Newman could bring the habeas petition as Padilla's next friend; (2) Secretary Rumsfeld was a proper respondent and the District Court had jurisdiction over him; (3) the Constitution and statutory law give the President authority to detain American citizens as enemy combatants; (4) Padilla was entitled to consult with counsel to pursue his habeas petition "under conditions that will minimize the likelihood that he [could] use his lawyers as unwilling intermediaries for the transmission of information to others"; (5) Padilla could present facts and argument to the court to rebut the government's showing that he was an enemy combatant; and (6) the court would "examine only whether the President had some evidence to support his finding that Padilla was an enemy combatant, and whether that evidence has been mooted by events subsequent to his detention." Padilla I, 233 F.Supp.2d at 569-70 (S.D.N.Y.2002). The court did not rely on the sealed Mobbs declaration in making its rulings. Id. at 610.
 
 
 15
 The District Court's order directed the parties to set conditions under which Padilla could meet with his counsel, but Secretary Rumsfeld declined to do so. Instead, more than a month after the Padilla I decision, the government moved for reconsideration of the portion of Padilla I that allowed him access to counsel, on the ground that no conditions could be set that would protect the national security. Padilla ex rel. Newman v. Rumsfeld, 243 F.Supp.2d 42, 43-46 (S.D.N.Y.2003) ("Padilla II"). Although Chief Judge Mukasey expressed doubts as to the procedural regularity of the motion, he nonetheless entertained it on the merits and denied it. Id. at 48-49, 57.
 
 
 16
 The government then moved for certification of the District Court's orders to obtain interlocutory review of the ruling on the issues on which it had lost. Chief Judge Mukasey certified his orders, identifying the following questions as "involv[ing]... controlling question[s] of law as to which there is substantial ground for difference of opinion" and the resolution of which "may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b) (2000); Padilla ex rel. Newman v. Rumsfeld, 256 F.Supp.2d 218, 222-23 (S.D.N.Y.2003) ("Padilla III"):
 
 
 17
 (1) Is the Secretary of Defense, Donald Rumsfeld, a proper respondent in this case?
 
 
 18
 (2) Does this court have personal jurisdiction over Secretary Rumsfeld?
 
 
 19
 (3) Does the President have the authority to designate as an enemy combatant an American citizen captured within the United States, and, through the Secretary of Defense, to detain him for the duration of armed conflict with al Qaeda?
 
 
 20
 (4) What burden must the government meet to detain petitioner as an enemy combatant?
 
 
 21
 (5) Does petitioner have the right to present facts in support of his habeas corpus petition?
 
 
 22
 (6) Was it a proper exercise of this court's discretion and its authority under the All Writs Act to direct that petitioner be afforded access to counsel for the purpose of presenting facts in support of his petition?
 
 
 23
 Id. at 223.
 
 
 24
 On June 10, 2003, this Court granted the parties' application for an interlocutory appeal.[5]
 
 DISCUSSION
 I. Preliminary Issues
 
 A. Next Friend Status
 [6]
 
 
 25
 The first of several issues in this appeal concerns attorney Newman's standing to proceed as "next friend" on Padilla's behalf. The government contends that Newman lacks standing because next friend status is restricted to counsel with a "longstanding" connection to a detainee, and that Newman's relationship with Padilla is not sufficient. Newman, on the other hand, contends that the established attorney-client relationship, under which she represented Padilla after his arrival in New York, is adequate for next friend standing because the nature of the relationship, not simply its duration, controls.
 
 
 26
 Next friend standing is authorized by 28 U.S.C. § 2242 (2000), which declares that a habeas petition may be brought "by the person for whose relief it is intended or by someone acting in his behalf." Id. (emphasis added). In Whitmore v. Arkansas, 495 U.S. 149, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990), the Supreme Court noted that next friend standing "has long been an accepted basis for jurisdiction in certain circumstances," and has most often been invoked "on behalf of detained prisoners who are unable, usually because of mental incompetence or inaccessibility, to seek relief themselves." Id. at 162, 110 S.Ct. 1717. "A `next friend' does not himself become a party to the habeas corpus action in which he participates, but simply pursues the cause on behalf of the detained person, who remains the real party in interest." Id. at 163, 110 S.Ct. 1717. A next friend "resembles an attorney, or a guardian ad litem, by whom a suit is brought or defended in behalf of another." Morgan v. Potter, 157 U.S. 195, 198, 15 S.Ct. 590, 39 L.Ed. 670 (1895). The availability of next friend status is, however, subject to significant limitations:
 
 
 27
 Decisions applying the habeas corpus statute have adhered to at least two firmly rooted prerequisites for "next friend" standing. First, a "next friend" must provide an adequate explanation — such as inaccessibility, mental incompetence, or other disability — why the real party in interest cannot appear on his own behalf to prosecute the action. Second, the "next friend" must be truly dedicated to the best interests of the person on whose behalf he seeks to litigate, and it has been further suggested that a "next friend" must have some significant relationship with the real party in interest. The burden is on the "next friend" clearly to establish the propriety of his status and thereby justify the jurisdiction of the court.
 
 
 28
 Whitmore, 495 U.S. at 163-64, 110 S.Ct. 1717 (internal citations omitted). These "limitations on the `next friend' doctrine are driven by the recognition that `[i]t was not intended that the writ of habeas corpus should be availed of, as matter of course, by intruders or uninvited meddlers, styling themselves next friends.'" Id. at 164, 110 S.Ct. 1717 (quoting United States ex rel. Bryant v. Houston, 273 F. 915, 916 (2d Cir.1921)).[7]
 
 
 29
 There is no dispute that Padilla is unable to file a petition on his own behalf — he is being held incommunicado. Similarly, there is no issue as to Newman's professional relationship with Padilla. As a member of the bar, she is, of course, duty-bound to represent Padilla and to protect his interests zealously and within the bounds of the law. See N.Y.Code Prof. Resp. DR 7-101. Newman was assigned to represent Padilla when he was first brought into the Southern District and, before his transfer to military custody, she had begun to advise Padilla about the legal implications of his apprehension and confinement. From May 15 to June 9, 2002, she met with him in an effort to vacate the material witness warrant and to secure his release. She filed motions on his behalf that attacked the legal basis of his confinement, met with his family and appeared in court with him. Moreover, she was perhaps the only person aware of his wishes when he was taken into custody by the DOD, and nothing in the record before us has called into question her suitability to pursue those wishes. Finally, she has continued ably to represent him and indeed she, with others, argued this appeal on his behalf. We find this relationship to be a significant one, notwithstanding its duration. We also find it one in which Newman is neither an "intruder" nor an "uninvited meddler," Whitmore, 495 U.S. at 164, 110 S.Ct. 1717, and, consequently, we conclude that the District Court properly approved Newman as Padilla's next friend.[8]
 
 
 B. Jurisdictional Issues
 
 
 30
 The government argues that because the proper respondent is Padilla's immediate custodian — Commander Melanie A. Marr, the commander of the brig in South Carolina, not Secretary Rumsfeld — the petition must be dismissed or transferred to the District of South Carolina because the Southern District of New York does not have jurisdiction. The government bases this contention on 28 U.S.C. §§ 2242 and 2243, which require a petitioner to "allege... the name of the person who has custody over him," instruct that the writ "be directed to the person having custody of the person detained," and provide that "the person to whom the writ is directed shall be required to produce at the hearing the body of the person detained."[9] The government asserts this language "indicates... there is only one proper respondent to a habeas petition," Commander Marr, who is not within the jurisdiction of the Southern District of New York. Vasquez v. Reno, 233 F.3d 688, 693 (1st Cir.2000). The government's jurisdictional argument thus raises two issues: who is the proper respondent and whether the Southern District of New York has jurisdiction over that individual.
 
 
 31
 
 i. Is Secretary Rumsfeld a Proper Respondent?
 
 
 
 32
 The government contends that in the usual habeas corpus case brought by a federal prisoner, courts have consistently held that the proper respondent is the warden of the facility, not the Attorney General. See, e.g., Sanders v. Bennett, 148 F.2d 19, 20 (D.C.Cir.1945). Similarly, it argues the proper respondent to a petition brought by a military prisoner challenging his confinement is the warden of the facility holding the soldier, not the Secretary of Defense. See, e.g., Monk v. Sec'y of the Navy, 793 F.2d 364, 369 (D.C.Cir.1986).[10] This traditional rule has been described as "a practical one based on common sense administration of justice." Sanders, 148 F.2d at 20. Relying on these principles, the government argues that the petition must be brought against Commander Marr, not Secretary Rumsfeld.
 
 
 33
 But this is not the usual situation. "[W]hat makes the usual case usual is that the petitioner is serving a sentence, and the list of those other than the warden who are responsible for his confinement includes only people who have played particular and discrete roles in confining him, notably the prosecuting attorney and the sentencing judge, and who no longer have a substantial and ongoing role in his continued confinement." Padilla I, 233 F.Supp.2d at 579. Thus, "[t]he warden becomes the respondent of choice almost by default." Id.
 
 
 34
 When habeas petitions are brought by persons detained for reasons other than federal criminal violations, the Supreme Court has recognized exceptions to the general practice of naming the immediate physical custodian as respondent. "The very nature of the writ demands that it be administered with the initiative and flexibility essential to insure that miscarriages of justice within its reach are surfaced and corrected." Harris v. Nelson, 394 U.S. 286, 291, 89 S.Ct. 1082, 22 L.Ed.2d 281 (1969). Moreover, the courts "have consistently rejected interpretations of the habeas corpus statute that would suffocate the writ in stifling formalisms or hobble its effectiveness with the manacles of arcane and scholastic procedural requirements." Lee v. United States, 501 F.2d 494, 503 n. 9 (8th Cir.1974) (Webster, J., concurring) (quoting Hensley v. Municipal Court, 411 U.S. 345, 350, 93 S.Ct. 1571, 36 L.Ed.2d 294 (1973)).
 
 
 35
 Ex parte Endo, 323 U.S. 283, 65 S.Ct. 208, 89 L.Ed. 243 (1944), for example, involved a Japanese-American woman originally interned at Tule Lake, California but later transferred to an internment camp in Utah. The Court held that her transfer did not destroy the California district court's jurisdiction over the habeas petition because there were potential respondents — the Secretary of the Interior or national officials of the War Relocation Authority — still within the court's jurisdictional reach. Id. at 304-06, 65 S.Ct. 208. Rather than formalistically require that Endo's immediate physical custodian be designated as the respondent, the Court recognized the flexibility of the Writ and concluded that the petition could properly be directed against national-level officials who have power to "produce[]" the petitioner even though they were not the immediate custodians. Id. at 305, 65 S.Ct. 208.[11]
 
 
 36
 Similarly, in Strait v. Laird, 406 U.S. 341, 92 S.Ct. 1693, 32 L.Ed.2d 141 (1972), the Court held that Strait, a California-domiciled inactive Army reservist under the command of an Indiana-based officer, could file a habeas action against that officer in California district court.[12] Although Strait's military records were kept with his commanding officer at Fort Benjamin Harrison, Indiana, Strait was at all times domiciled in California and was never in or assigned to Indiana. When ordered to report to active duty at Fort Gordon, Georgia, he filed an application for discharge as a conscientious objector. His application was processed at Fort Ord, California and his superiors in California recommended discharge, but on review, the application was denied. Thereafter, Strait filed a petition for a writ of habeas corpus in California naming his commander in Indiana as the respondent. The Supreme Court held that jurisdiction was proper in California. It concluded that "virtually every face-to-face contact between [Strait] and the military occurred in California" at the direction of the Indiana officer. Id. at 344, 92 S.Ct. 1693. Accordingly, the Court held that because the Indiana commander had the responsibility to decide whether to release Strait, he was an appropriate respondent despite the intervening level of military personnel that dealt with Strait directly.
 
 
 37
 Under Strait's "broad concept" of custodian, the appropriate focus was whether the respondent, through his agent, was responsible for Strait's detention.[13] Strait, however, did not calibrate the distance in the chain of command sufficient for designation as a "custodian" for habeas purposes. Although Strait named the Secretary of Defense as a respondent in addition to Strait's Indiana commanding officer, the Court did not discuss whether the Secretary was a proper respondent. In any event, it was clear there, unlike here, that the Secretary had no direct responsibility for the denial of Strait's application for conscientious objector status.
 
 
 38
 Finally, in Braden v. 30th Judicial Circuit Court of Kentucky, 410 U.S. 484, 93 S.Ct. 1123, 35 L.Ed.2d 443 (1973), Kentucky filed a detainer against Braden while he was imprisoned in Alabama on unrelated charges. The Court held that, notwithstanding his confinement in Alabama, he could file a habeas petition against Kentucky authorities in Kentucky federal district court to challenge Kentucky's alleged failure to grant him a speedy trial on that state's charges.[14] Id. at 500, 93 S.Ct. 1123. The Court determined that 28 U.S.C. § 2241(a) requires nothing more than that the court issuing the writ have jurisdiction over the custodian of the prisoner. The fact that "the prisoner himself [was] confined outside the court's territorial jurisdiction" was immaterial; what was dispositive was the court's jurisdiction over the "custodian." Id. at 495, 93 S.Ct. 1123.[15] Importantly, the proper respondent was the entity with the power to limit the petitioner's freedom: the Kentucky authorities that filed the detainer. Simply put, Braden could not seek relief from the detainer without making the Kentucky court a party to the proceeding.[16]
 
 
 39
 The unique role Secretary Rumsfeld plays in this matter leads us to conclude that he is a proper respondent. Secretary Rumsfeld was charged by the President in the June 9 Order with detaining Padilla. In following that Order, the Secretary sent DOD personnel into the Southern District of New York to take custody of Padilla. Secretary Rumsfeld, or his designees, determined that Padilla would be sent to the brig in South Carolina. Although Commander Marr is the commander of the Brig, the legal reality of control is vested with Secretary Rumsfeld, since only he — not Commander Marr — could inform the President that further restraint of Padilla as an enemy combatant is no longer necessary. In this respect, "the extraordinary and pervasive role that [Secretary Rumsfeld] played in [this] matter[] is virtually unique." Henderson v. INS, 157 F.3d 106, 126 (2d Cir.1998).[17] In fact, this degree of Cabinet-level involvement is unprecedented as far as we have been able to determine. Accordingly, we do not undertake to articulate a rule defining the proper respondent in a habeas case other than one involving a petitioner designated as an enemy combatant under circumstances congruent with Padilla's designation and detention. We only hold that, here, Secretary Rumsfeld is the proper respondent.
 
 
 40
 
 ii. Whether the Court has Jurisdiction over Secretary Rumsfeld
 
 
 
 41
 The government argues that even if Secretary Rumsfeld were a proper respondent, he is located in the Eastern District of Virginia beyond the District Court's habeas jurisdiction, because 28 U.S.C. § 2241(a) limits district courts to issuing writs "within their respective jurisdictions," 28 U.S.C. § 2241(a), and this means that "habeas corpus jurisdiction does not extend to officials outside the court's territorial limits." Malone v. Calderon, 165 F.3d 1234, 1237 (9th Cir.1999). Under this analysis, long-arm jurisdiction is not applicable to habeas petitions. Newman, on the other hand, maintains that a federal district court sitting in New York has habeas jurisdiction over a non-resident "custodian" if he can be reached under the state's process — here, New York's long-arm statute. See N.Y. C.P.L.R. § 302 (McKinney 2003).
 
 
 42
 The Supreme Court in Ahrens v. Clark, 335 U.S. 188, 68 S.Ct. 1443, 92 L.Ed. 1898 (1948), had construed section 2241(a)'s language of "within their respective jurisdictions" to require a habeas petitioner to be physically present within the district. See id. at 190, 68 S.Ct. 1443. But Braden overruled Ahrens and dispensed with this requirement:
 
 
 43
 Read literally, the language of § 2241(a) requires nothing more than that the court issuing the writ have jurisdiction over the custodian. So long as the custodian can be reached by service of process, the court can issue a writ "within its jurisdiction" requiring that the prisoner be brought before the court for a hearing on his claim, or requiring that he be released outright from custody, even if the prisoner himself is confined outside the court's territorial jurisdiction.
 
 
 44
 Braden, 410 U.S. at 495, 93 S.Ct. 1123.
 
 
 45
 Moreover, Supreme Court law predating Braden supports the conclusion that habeas jurisdiction requires only that the district court have personal jurisdiction over the respondent — long-arm or otherwise. In Strait, the Court held that the reservist located in California could bring a habeas petition in that state against his Indiana-based commanding officer, rejecting the contention that long-arm jurisdiction does not apply in the habeas context:
 
 
 46
 Strait's commanding officer is "present" in California through the officers in the hierarchy of the command who processed this serviceman's application for discharge. To require him to go to Indiana where he never has been or assigned to be would entail needless expense and inconvenience.
 
 
 47
 406 U.S. at 345, 92 S.Ct. 1693 (footnote omitted). The Court added:
 
 
 48
 That such "presence" may suffice for personal jurisdiction is well settled, McGee v. Int'l Life Ins. Co., 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223; Int'l Shoe Co. v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95, and the concept is also not a novel one as regards habeas corpus jurisdiction. In Ex parte Endo, 323 U.S. 283, 307, 65 S.Ct. 208, 89 L.Ed. 243, we said that habeas corpus may issue "if a respondent who has custody of the prisoner is within reach of the court's process."
 
 
 49
 Id. n. 2, 92 S.Ct. 1693. The issue, then, is whether Secretary Rumsfeld is subject to the personal jurisdiction of the Southern District of New York. See, e.g., United States ex rel. Sero v. Preiser, 506 F.2d 1115, 1128-29 (2d Cir.1974) (interpreting Braden to require only that the custodian be reachable by the state's long-arm statute).
 
 
 50
 The breadth of a federal court's personal jurisdiction is determined by the law of the state in which the district court is located. See Fed.R.Civ.P. 4(k)(1)(A); United States v. First Nat'l Bank, 379 U.S. 378, 381, 85 S.Ct. 528, 13 L.Ed.2d 365 (1965); Henderson, 157 F.3d at 123. New York's long-arm statute provides that personal jurisdiction may be asserted over any non-domiciliary if, "in person or through an agent," he "transacts any business within the state" or "commits a tortious act within the state," as long as the particular cause of action asserted is one "arising from" any of those acts. N.Y.C.P.L.R. § 302(a)(1),(2) (McKinney 2003).[18] Its purpose was to extend the jurisdiction of New York courts over nonresidents who have "engaged in some purposeful activity [here] in connection with the matter in suit." Longines-Wittnauer Watch Co. v. Barnes & Reinecke, Inc., 15 N.Y.2d 443, 457, 261 N.Y.S.2d 8, 209 N.E.2d 68 (1965). Section 302 is a single-act statute; jurisdiction attaches if the defendant engages in a single purposeful activity that has a substantial relationship or articulable nexus to the claim asserted. See Parke-Bernet Galleries, Inc. v. Franklyn, 26 N.Y.2d 13, 16-17, 308 N.Y.S.2d 337, 256 N.E.2d 506 (1970); see also Henderson, 157 F.3d at 123. Moreover, the statute's jurisprudential gloss and its legislative history suggest that its "transacts business" clause is not restricted to commercial activity.[19] In fact, the advisory committee which drafted the section decided to follow the broad, inclusive language of the Illinois long-arm statute then in effect, adopting as the criterion the "[transaction of] any business within the state." N.Y.C.P.L.R. § 302(a)(1); Ill. Stat. Ann., ch. 110 § 17 (Smith-Hurd 1956). Its legislative history indicates that it was designed to take advantage of the "new [jurisdictional] enclave" opened up by International Shoe Co. v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), where the nonresident defendant has engaged in some purposeful activity in this State in connection with the suit. See N.Y. Advisory Comm. Rep. (N.Y.Legis.Doc., 1958, No. 13), at 39-40.[20]
 
 
 51
 We have little difficulty concluding that Secretary Rumsfeld is amenable to process under New York's long-arm statute. Although the Department of Justice ("DOJ") was responsible for bringing Padilla into the Southern District as a material witness and for detaining him at the MCC — a DOJ facility — all of the activities salient to Padilla's claim were completed or initiated by Secretary Rumsfeld or his agents in the Southern District of New York. Secretary Rumsfeld was charged by the President in the June 9 Order with detaining Padilla.[21] Pursuant to that Order, the material witness warrant was withdrawn and Secretary Rumsfeld was instructed to take custody of Padilla. Secretary Rumsfeld then sent DOD personnel into the Southern District of New York to (1) remove Padilla from the MCC, (2) detain Padilla, and (3) transfer him to South Carolina. Most importantly, Padilla's status was transformed in the Southern District — he arrived in New York a material witness in a grand jury investigation related to the September 11 attacks and departed an enemy combatant. In our opinion, these purposeful contacts of Secretary Rumsfeld with the Southern District of New York, whether personal or through agents, were substantially related to the claims asserted by Padilla and are therefore sufficient to confer personal jurisdiction over the Secretary by the District Court. See N.Y. C.P.L.R. § 302 (McKinney 2003); see also Longines, 15 N.Y.2d at 457, 261 N.Y.S.2d 8, 209 N.E.2d 68.[22]
 
 II. Power to Detain
 
 A. Introduction
 
 
 52
 The District Court concluded, and the government maintains here, that the indefinite detention of Padilla was a proper exercise of the President's power as Commander-in-Chief. The power to detain Padilla is said to derive from the President's authority, settled by Ex parte Quirin, 317 U.S. 1, 63 S.Ct. 1, 87 L.Ed. 3 (1942), to detain enemy combatants in war-time — authority that is argued to encompass the detention of United States citizens seized on United States soil. This power, the court below reasoned, may be exercised without a formal declaration of war by Congress and "even if Congressional authorization were deemed necessary, the Joint Resolution, passed by both houses of Congress, ... engages the President's full powers as Commander in Chief." Padilla I, 233 F.Supp.2d at 590. Specifically, the District Court found that the Joint Resolution acted as express congressional authorization under 18 U.S.C. § 4001(a), which prohibits the detention of American citizens absent such authorization. Id. at 598-99. In addition, the government claims that 10 U.S.C. § 956(5), a statute that allows the military to use authorized funds for certain detentions, grants authority to detain American citizens.
 
 
 53
 These alternative arguments require us to examine the scope of the President's inherent power and, if this is found insufficient to support Padilla's detention, whether Congress has authorized such detentions of American citizens. We reemphasize, however, that our review is limited to the case of an American citizen arrested in the United States, not on a foreign battlefield or while actively engaged in armed conflict against the United States. As the Fourth Circuit recently — and accurately — noted in Hamdi v. Rumsfeld, "[t]o compare this battlefield capture [of Hamdi] to the domestic arrest in Padilla v. Rumsfeld is to compare apples and oranges." 337 F.3d 335, 344 (4th Cir.2003) ("Hamdi IV") (Wilkinson, J., concurring).
 
 
 B. The Youngstown Analysis
 
 
 54
 Our review of the exercise by the President of war powers in the domestic sphere starts with the template the Supreme Court constructed in Youngstown, 343 U.S. at 635-38, 72 S.Ct. 863 (Jackson, J., concurring). Youngstown involved the validity of President Truman's efforts during the Korean War to seize the country's steel mills on the eve of a nationwide strike by steelworkers. Id. at 582-85, 72 S.Ct. 863. Writing for the majority, Justice Black explained that the President's power "must stem either from an act of Congress or from the Constitution itself." Id. at 585, 72 S.Ct. 863. The Court held that the seizure could not be justified as a function of the President's Commander-in-Chief powers and that it had not been authorized by Congress. Id. at 587-88, 72 S.Ct. 863. Justice Jackson's concurrence, which provides the framework for reviewing the validity of executive action, posits three categories for evaluating the exercise of emergency powers by the President. See, e.g., Dames & Moore v. Regan, 453 U.S. 654, 668-69, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981); Hamdi v. Rumsfeld, 296 F.3d 278, 281 (4th Cir.2002) ("Hamdi II").
 
 
 55
 First, when the President acts pursuant to an express or implied authorization from Congress, "his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate." Youngstown, 343 U.S. at 635, 72 S.Ct. 863 (Jackson, J., concurring). This category is exemplified by the power exercised by the President in Quirin and in United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255 (1936). Second, when the President acts in the absence of either a congressional grant or denial of authority, "he can only rely upon his own independent powers, but there is a zone of twilight in which he and Congress may have concurrent authority, or in which its distribution is uncertain." Youngstown, 343 U.S. at 637, 72 S.Ct. 863. Finally, the third category includes those situations where the President takes measures incompatible with the express or implied will of Congress. In such cases, "his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter." Id. The "[c]ourts can sustain exclusive presidential control [in this situation] only by disabling the Congress from acting upon the subject." Id. at 637-38, 72 S.Ct. 863.
 
 
 56
 Here, we find that the President lacks inherent constitutional authority as Commander-in-Chief to detain American citizens on American soil outside a zone of combat. We also conclude that the Non-Detention Act serves as an explicit congressional "denial of authority" within the meaning of Youngstown, thus placing us in Youngstown's third category. Finally, we conclude that because the Joint Resolution does not authorize the President to detain American citizens seized on American soil, we remain within Youngstown's third category.
 
 
 57
 
 i. Inherent Power
 
 
 
 58
 The government contends that the President has the inherent authority to detain those who take up arms against this country pursuant to Article II, Section 2, of the Constitution, which makes him the Commander-in-Chief, and that the exercise of these powers domestically does not require congressional authorization. Moreover, the argument goes, it was settled by Quirin that the military's authority to detain enemy combatants in wartime applies to American citizens as well as to foreign combatants. There the Supreme Court explained that "universal agreement and practice" under "the law of war" holds that "[l]awful combatants are subject to capture and detention as prisoners of war by opposing military forces" and "[u]nlawful combatants are likewise subject to capture and detention, but in addition they are subject to trial and punishment by military tribunals for acts which render their belligerency unlawful." 317 U.S. at 30-31, 63 S.Ct. 1. Finally, since the designation of an enemy combatant bears the closest imaginable connection to the President's constitutional responsibilities, principles of judicial deference are said by the government to assume heightened significance.
 
 
 59
 We agree that great deference is afforded the President's exercise of his authority as Commander-in-Chief. See Dep't of the Navy v. Egan, 484 U.S. 518, 530, 108 S.Ct. 818, 98 L.Ed.2d 918 (1988). We also agree that whether a state of armed conflict exists against an enemy to which the laws of war apply is a political question for the President, not the courts. See Johnson v. Eisentrager, 339 U.S. 763, 789, 70 S.Ct. 936, 94 L.Ed. 1255 (1950) ("Certainly it is not the function of the Judiciary to entertain private litigation — even by a citizen — which challenges the legality, the wisdom, or the propriety of the Commander-in-Chief in sending our armed forces abroad or to any particular region."); The Prize Cases, 67 U.S. (2 Black) 635, 670, 17 L.Ed. 459 (1862). Because we have no authority to do so, we do not address the government's underlying assumption that an undeclared war exists between al Qaeda and the United States. We have no quarrel with the former chief of the Justice Department's Criminal Division, who said:
 
 
 60
 For [al Qaeda] chose not to violate the law but to attack the law and its institutions directly. Their proclaimed goal, however unrealistic, was to destroy the United States. They used powerful weapons of destructive force and openly declared their willingness to employ even more powerful weapons of mass destruction if they could lay hold of them. They were as serious a threat to the national security of the United States as one could envision.
 
 
 61
 Michael Chertoff, Law, Loyalty, and Terror: Our Legal Response to the Post-9-11 World, Wkly. Standard, Dec. 1, 2003, at 15.
 
 
 62
 However, it is a different proposition entirely to argue that the President even in times of grave national security threats or war, whether declared or undeclared, can lay claim to any of the powers, express or implied, allocated to Congress. The deference due to the Executive in its exercise of its war powers therefore only starts the inquiry; it does not end it. Where the exercise of Commander-in-Chief powers, no matter how well intentioned, is challenged on the ground that it collides with the powers assigned by the Constitution to Congress, a fundamental role exists for the courts. See Marbury v. Madison, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803). To be sure, when Congress and the President act together in the conduct of war, "it is not for any court to sit in review of the wisdom of their action or substitute its judgment for theirs." Hirabayashi v. United States, 320 U.S. 81, 93, 63 S.Ct. 1375, 87 L.Ed. 1774 (1943). But when the Executive acts, even in the conduct of war, in the face of apparent congressional disapproval, challenges to his authority must be examined and resolved by the Article III courts. See Youngstown, 343 U.S. at 638, 72 S.Ct. 863 (Jackson, J., concurring).
 
 
 63
 These separation of powers concerns are heightened when the Commander-in-Chief's powers are exercised in the domestic sphere. The Supreme Court has long counseled that while the Executive should be "indulge[d] the widest latitude of interpretation to sustain his exclusive function to command the instruments of national force, at least when turned against the outside world for the security of our society," he enjoys "no such indulgence" when "it is turned inward." Youngstown, 343 U.S. at 645, 72 S.Ct. 863 (Jackson, J., concurring). This is because "the federal power over external affairs [is] in origin and essential character different from that over internal affairs," and "congressional legislation which is to be made effective through negotiation and inquiry within the international field must often accord to the President a degree of discretion and freedom from statutory restriction which would not be admissible were domestic affairs alone involved." Curtiss-Wright, 299 U.S. at 319, 320, 57 S.Ct. 216. But, "Congress, not the Executive, should control utilization of the war power as an instrument of domestic policy." Youngstown, 343 U.S. at 644, 72 S.Ct. 863 (Jackson, J., concurring). Thus, we do not concern ourselves with the Executive's inherent wartime power, generally, to detain enemy combatants on the battlefield. Rather, we are called on to decide whether the Constitution gives the President the power to detain an American citizen seized in this country until the war with al Qaeda ends.
 
 
 64
 The government contends that the Constitution authorizes the President to detain Padilla as an enemy combatant as an exercise of inherent executive authority. Padilla contends that, in the absence of express congressional authorization, the President, by his June 9 Order denominating Padilla an enemy combatant, has engaged in the "lawmaking" function entrusted by the Constitution to Congress in violation of the separation of powers. In response, no argument is made that the Constitution expressly grants the President the power to name United States citizens as enemy combatants and order their detention. Rather, the government contends that the Commander-in-Chief Clause implicitly grants the President the power to detain enemy combatants domestically during times of national security crises such as the current conflict with al Qaeda. U.S. Const. art. II, § 2.
 
 
 65
 As an initial matter, we note that in its explicit vesting of powers in Articles I and II, the Constitution circumscribes and defines the respective functions of the political branches. INS v. Chadha, 462 U.S. 919, 946, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983) ("The very structure of the Articles delegating and separating powers under Arts. I, II, and III exemplifies the concept of separation of powers...."). The Constitution gives Congress the full legislative powers of government and at the same time, gives the President full executive authority and responsibility to "take care" that the laws enacted are faithfully executed. U.S. Const. art I, § 1, art. II, §§ 1, 3; Loving v. United States, 517 U.S. 748, 758, 116 S.Ct. 1737, 135 L.Ed.2d 36 (1996) ("[T]he lawmaking function belongs to Congress ... and may not be conveyed to another branch or entity"); Field v. Clark, 143 U.S. 649, 692, 12 S.Ct. 495, 36 L.Ed. 294 (1892). Thus, while the President has the obligation to enforce laws passed by Congress, he does not have the power to legislate.
 
 
 66
 The propriety of a given branch's conduct does not turn on the labeling of activity as "legislative" or "executive." See Mistretta v. United States, 488 U.S. 361, 393, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989). Legislative action depends "not on form but upon whether [it] contain[s] matter which is properly to be regarded as legislative in its character and effect." Chadha, 462 U.S. at 952, 103 S.Ct. 2764 (internal quotation marks omitted). Thus, we must look to whether the exercise of power in question has been "subject to the carefully crafted restraints spelled out in the Constitution," id. at 959, 103 S.Ct. 2764, to ensure that authority is exercised only by the branch to which it has been allocated. See Youngstown, 343 U.S. at 587-88, 72 S.Ct. 863.
 
 
 67
 The Constitution entrusts the ability to define and punish offenses against the law of nations to the Congress, not the Executive. U.S. Const. art. I, § 8, cl. 10; United States v. Arjona, 120 U.S. 479, 483, 7 S.Ct. 628, 30 L.Ed. 728 (1887). Padilla contends that the June 9 Order mandating his detention as an "enemy combatant" was not the result of congressional action defining the category of "enemy combatant." He also argues that there has been no other legislative articulation of what constitutes an "enemy combatant," what circumstances trigger the designation, or when it ends. As in Youngstown, Padilla maintains that "[t]he President's order does not direct that a congressional policy be executed in a manner prescribed by Congress — it directs that a presidential policy be executed in a manner prescribed by the President." Youngstown, 343 U.S. at 588, 72 S.Ct. 863.
 
 
 68
 The Constitution envisions grave national emergencies and contemplates significant domestic abridgements of individual liberties during such times. See Kennedy v. Mendoza-Martinez, 372 U.S. 144, 159-60, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963). Here, the Executive lays claim to the inherent emergency powers necessary to effect such abridgements, but we agree with Padilla that the Constitution lodges these powers with Congress, not the President. See Youngstown, 343 U.S. at 649-50, 72 S.Ct. 863 (Jackson, J., concurring).
 
 
 69
 First, the Constitution explicitly provides for the suspension of the writ of habeas corpus "when in Cases of Rebellion or Invasion the public Safety may require it." U.S. Const. art. I, § 9, cl. 2. This power, however, lies only with Congress. Ex parte Bollman, 8 U.S. (4 Cranch) 75, 101, 2 L.Ed. 554 (1807). Further, determinations about the scope of the writ are for Congress. Lonchar v. Thomas, 517 U.S. 314, 323, 116 S.Ct. 1293, 134 L.Ed.2d 440 (1996).
 
 
 70
 Moreover, the Third Amendment's prohibition on the quartering of troops during times of peace reflected the Framers' deep-seated beliefs about the sanctity of the home and the need to prevent military intrusion into civilian life.[23] See, e.g., Laird v. Tatum, 408 U.S. 1, 15, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972); Katz v. United States, 389 U.S. 347, 350 n. 5, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). At the same time they understood that in times of war — of serious national crisis — military concerns prevailed and such intrusions could occur. But significantly, decisions as to the nature and scope of these intrusions were to be made "in a manner to be prescribed by law." U.S. Const. amend. III. The only valid process for making "law" under the Constitution is, of course, via bicameral passage and presentment to the President, whose possible veto is subject to congressional override, provided in Article I, Section 7. See Chadha, 462 U.S. at 946-51, 103 S.Ct. 2764.
 
 
 71
 The Constitution's explicit grant of the powers authorized in the Offenses Clause, the Suspension Clause, and the Third Amendment, to Congress is a powerful indication that, absent express congressional authorization, the President's Commander-in-Chief powers do not support Padilla's confinement. See id. at 946, 103 S.Ct. 2764. The level of specificity with which the Framers allocated these domestic powers to Congress and the lack of any even near-equivalent grant of authority in Article II's catalogue of executive powers compels us to decline to read any such power into the Commander-in-Chief Clause. In sum, while Congress — otherwise acting consistently with the Constitution — may have the power to authorize the detention of United States citizens under the circumstances of Padilla's case, the President, acting alone, does not.[24] See Youngstown, 343 U.S. at 631-32, 72 S.Ct. 863 (Douglas, J., concurring).
 
 
 72
 The government argues that Quirin established the President's inherent authority to detain Padilla. In Quirin, the Supreme Court reviewed the habeas petitions of German soldiers captured on United States soil during World War II. All of the petitioners had lived in the United States at some point in their lives and had been trained in the German Army in the use of explosives. See 317 U.S. at 20-21, 63 S.Ct. 1. These soldiers, one of whom would later claim American citizenship, landed in the United States and shed their uniforms intending to engage in acts of military sabotage. They were arrested in New York and Chicago, tried by a military commission as "unlawful combatants," and sentenced to death. The Court denied the soldiers' petitions for habeas corpus, holding that the alleged American citizenship of one of the saboteurs was immaterial to its judgment: "Citizenship in the United States of an enemy belligerent does not relieve him from the consequences of a belligerency which is unlawful because in violation of the law of war." Id. at 37, 63 S.Ct. 1. The government contends that Quirin conclusively establishes the President's authority to exercise military jurisdiction over American citizens.
 
 
 73
 We do not agree that Quirin controls. First, and most importantly, the Quirin Court's decision to uphold military jurisdiction rested on express congressional authorization of the use of military tribunals to try combatants who violated the laws of war. Id. at 26-28, 63 S.Ct. 1. Specifically, the Court found it "unnecessary for present purposes to determine to what extent the President as Commander in Chief has constitutional power to create military commissions without the support of Congressional legislation." Id. at 29, 63 S.Ct. 1.[25] Accordingly, Quirin does not speak to whether, or to what degree, the President may impose military authority upon United States citizens domestically without clear congressional authorization. We are reluctant to read into Quirin a principle that the Quirin Court itself specifically declined to promulgate.[26]
 
 
 74
 Moreover, there are other important distinctions between Quirin and this case. First, when Quirin was decided in 1942, section 4001(a) had not yet been enacted. The Quirin Court consequently had no occasion to consider the effects of legislation prohibiting the detention of American citizens absent statutory authorization. As a result, Quirin was premised on the conclusion — indisputable at the time — that the Executive's domestic projection of military authority had been authorized by Congress. Because the Quirin Court did not have to contend with section 4001(a), its usefulness is now sharply attenuated.
 
 
 75
 Second, the petitioners in Quirin admitted that they were soldiers in the armed forces of a nation against whom the United States had formally declared war. The Quirin Court deemed it unnecessary to consider the dispositive issue here — the boundaries of the Executive's military jurisdiction — because the Quirin petitioners "upon the conceded facts, were plainly within those boundaries." Id. at 46, 63 S.Ct. 1. Padilla makes no such concession. To the contrary, he, from all indications, intends to dispute his designation as an enemy combatant, and points to the fact that the civilian accomplices of the Quirin saboteurs — citizens who advanced the sabotage plots but who were not members of the German armed forces — were charged and tried as civilians in civilian courts, not as enemy combatants subject to military authority. Haupt v. United States, 330 U.S. 631, 67 S.Ct. 874, 91 L.Ed. 1145 (1947); Cramer v. United States, 325 U.S. 1, 65 S.Ct. 918, 89 L.Ed. 1441 (1945).
 
 
 76
 In Ex parte Milligan, 71 U.S. (4 Wall.) 2, 18 L.Ed. 281 (1866), the government unsuccessfully attempted to prosecute before a military tribunal a citizen who, never having belonged to or received training from the Confederate Army, "conspired with bad men" to engage in acts of war and sabotage against the United States. 71 U.S. at 131. Although Quirin distinguished Milligan on the ground that "Milligan, not being a part of or associated with the armed forces of the enemy, was a non-belligerent, [and] not subject to the law of war," 317 U.S. at 45, 63 S.Ct. 2, a more germane distinction rests on the different statutes involved in Milligan and Quirin. During the Civil War, Congress authorized the President to suspend the writ of habeas corpus. Milligan, 71 U.S. at 4. However, it also limited his power to detain indefinitely "citizens of States in which the administration of the laws had continued unimpaired in the Federal courts, who were then held, or might thereafter be held, as prisoners of the United States, under the authority of the President, otherwise than as prisoners of war." Id. at 5.
 
 
 77
 This limitation was embodied in a requirement that the Executive furnish a list of such prisoners to the district and circuit courts and, upon request by a prisoner, release him if the grand jury failed to return an indictment. Id. The grand jury sitting when Milligan was detained failed to indict him. Id. at 7. The Court concluded that because "Congress could grant no... power" to authorize the military trial of a civilian in a state where the courts remained open and functioning, and because congress had not attempted to do so Milligan could not be tried by a military tribunal. Id. at 121-22. Thus, both Quirin and Milligan are consistent with the principle that primary authority for imposing military jurisdiction upon American citizens lies with Congress. Even though Quirin limits to a certain extent the broader holding in Milligan that citizens cannot be subjected to military jurisdiction while the courts continue to function, Quirin and Milligan both teach that — at a minimum — an Act of Congress is required to expand military jurisdiction.
 
 
 78
 The government's argument for the legality of Padilla's detention also relies heavily on the Fourth Circuit's decisions in Hamdi II and Hamdi III. These decisions are inapposite. The Fourth Circuit directly predicated its holdings on the undisputed fact that Hamdi was captured in a zone of active combat in Afghanistan. Hamdi III, 316 F.3d at 459 ("Because it is undisputed that Hamdi was captured in a zone of active combat in a foreign theater of conflict, we hold that ... [n]o further factual inquiry is necessary or proper."). The court said:
 
 
 79
 "We have no occasion ... to address the designation as an enemy combatant of an American citizen captured on American soil or the role that counsel might play in such a proceeding. We shall, in fact, go no further in this case than the specific context before us — that of the undisputed detention of a citizen during a combat operation undertaken in a foreign country."
 
 
 80
 Hamdi III, at 465 (internal citation omitted).
 
 
 81
 The dissent also relies on The Prize Cases, which, like Milligan, arose out of the Civil War, to conclude that the President has the inherent constitutional authority to protect the nation when met with belligerency and to determine what degree of responsive force is necessary. Neither the facts nor the holding of The Prize Cases supports such a broad construction.
 
 
 82
 First, The Prize Cases dealt with the capture of enemy property — not the detention of persons. The Court had no occasion to address the strong constitutional arguments against deprivations of personal liberty, or the question of whether the President could infringe upon individual liberty rights through the exercise of his wartime powers outside a zone of combat.
 
 
 83
 Second, the dissent would have us read The Prize Cases as resolving any question as to whether the President may detain Padilla as an enemy combatant without congressional authorization. The Court did not, however, rest its decision upholding the exercise of the President's military authority solely on his constitutional powers without regard to congressional authorization. Rather, it noted that the President's authority to "call[] out the militia and use the military and naval forces of the United States in case of invasion by foreign nations, and to suppress insurrection against the government" stemmed from "the Acts of Congress of February 28th, 1795, and 3d of March, 1807." Id. at 668. In any event, Congress's subsequent ratification of the President's wartime orders mooted any questions of presidential authority. Id. at 670. Finally, the Court in The Prize Cases was not faced with the Non-Detention Act specifically limiting the President's authority to detain American citizens absent express congressional authorization.
 
 
 84
 Based on the text of the Constitution and the cases interpreting it, we reject the government's contention that the President has inherent constitutional power to detain Padilla under the circumstances presented here.[27] Therefore, under Youngstown, we must now consider whether Congress has authorized such detentions.
 
 
 85
 
 ii. Congressional Acts
 
 
 
 86
 
 a. The Non-Detention Act
 
 
 
 87
 As we have seen, the Non-Detention Act provides: "No citizen shall be imprisoned or otherwise detained by the United States except pursuant to an Act of Congress." 18 U.S.C. § 4001(a). The District Court held that this language "encompasses all detentions of United States citizens." Padilla I, 233 F.Supp.2d at 597.
 
 
 88
 We review this interpretation de novo. United States v. Lucien, 347 F.3d 45, 50 (2d Cir.2003). In conducting our review, we must first examine the language of the statute and assume that its "ordinary meaning... accurately expresses the legislative purpose." Id. at 51 (internal quotation marks omitted). If the plain language is unambiguous, "judicial inquiry ends, except in `rare and exceptional circumstances,' and legislative history is instructive only upon `the most extraordinary showing of contrary intentions.'" Id. (quoting Garcia v. United States, 469 U.S. 70, 75, 105 S.Ct. 479, 83 L.Ed.2d 472 (1984)).
 
 
 89
 We read the plain language of section 4001(a) to prohibit all detentions of citizens — a conclusion first reached by the Supreme Court. Howe v. Smith, 452 U.S. 473, 479 n. 3, 101 S.Ct. 2468, 69 L.Ed.2d 171 (1981) (characterizing the Non-Detention Act as "proscribing detention of any kind by the United States" (emphasis in original)). Not only has the government not made an extraordinary showing of contrary intentions, but the legislative history of the Non-Detention Act is fully consistent with our reading of it. Both the sponsor of the Act and its primary opponent repeatedly confirmed that the Act applies to detentions by the President during war and other times of national crisis. The legislative history is replete with references to the detentions of American citizens of Japanese descent during World War II, detentions that were authorized both by congressional acts and by orders issued pursuant to the President's war power. This context convinces us that military detentions were intended to be covered. Finally, the legislative history indicates that Congress understood that exceptions to the Non-Detention Act must specifically authorize detentions.
 
 
 90
 Section 4001(a) was enacted in 1971 and originated as an amendment to legislation repealing the Emergency Detention Act of 1950, former 50 U.S.C. §§ 811-26 (1970), which authorized the detention by the Attorney General during an invasion, a declared war, or "an insurrection within the United States in aid of a foreign enemy" of "each person as to whom there is reasonable ground to believe that such person probably will engage in, or probably will conspire with others to engage in, acts of espionage or of sabotage." 50 U.S.C. §§ 812(a), 813(a) (1970). Congress referred to section 4001(a) as the Railsback amendment for its drafter, Representative Railsback. The Railsback amendment emerged from the House Judiciary Committee and was opposed by the House Internal Security Committee, which offered other alternatives.
 
 
 91
 Congressman Ichord, the chair of the House Internal Security Committee and the primary opponent of the Railsback amendment, argued that it would tie the President's hands in times of national emergency or war. He characterized the amendment as "this most dangerous committee amendment" and as "depriv[ing] the President of his emergency powers and his most effective means of coping with sabotage and espionage agents in war-related crises." 117 Cong. Rec. H31542 (daily ed. Sept. 13, 1971). Representative Ichord's alarm stemmed from his belief that Youngstown "teaches that where the Congress has acted on a subject within its jurisdiction, sets forth its policy, and asserts its authority, the President might not thereafter act in a contrary manner." Id. at H31544; see id. at H31549 ("I do feel that the language of the amendment drafted by [Representative Railsback] under the Youngstown Steel case would prohibit even the picking up, at the time of a declared war, at a time of an invasion of the United States, a man whom we would have reasonable cause to believe would commit espionage or sabotage.").
 
 
 92
 No proponent of the Railsback amendment challenged Representative Ichord's interpretation. In fact, in a striking exchange between Representatives Ichord and Railsback, he ratified Representative Ichord's interpretation. Representative Ichord asked: "Does [Representative Railsback] believe that in this country today there are people who are skilled in espionage and sabotage that might pose a possible threat to this Nation in the event of a war with nations of which those people are nationals or citizens?" Id. at H31551. Representative Railsback responded, "Yes." Id. Representative Ichord then asked: "Does the gentleman believe then that if we were to become engaged in a war with the country of those nationals, that we would permit those people to run at large without apprehending them, and wait until after the sabotage is committed?" Id. Railsback answered:
 
 
 93
 I think what would happen is what J. Edgar Hoover thought could have happened when he opposed the actions that were taken in 1942. He suggested the FBI would have under surveillance those people in question and those persons they had probable cause to think would commit such actions. Does the gentleman know that J. Edgar Hoover was opposed to detention camps, because be thought he had sufficient personnel to keep all these potential saboteurs under surveillance, and that they could prosecute the guilty in accordance with due process?
 
 
 94
 Id. at H31551-52. Railsback also suggested to Congress that the President could seize citizens only pursuant to an Act of Congress or during a time of martial law when the courts are not open. Id. at 31755.[28]
 
 
 95
 Congress's passage of the Railsback amendment by a vote of 257 to 49 after ample warning that both the sponsor of the amendment and its primary opponent believed it would limit detentions in times of war and peace alike is strong evidence that the amendment means what it says, that is that no American citizen can be detained without a congressional act authorizing the detention.
 
 
 96
 In addition, almost every representative who spoke in favor of repeal of the Emergency Detention Act or adoption of the Railsback amendment or in opposition to other amendments, described the detention of Japanese-American citizens during World War II as the primary motivation for their positions. See, e.g., id. at H31537 (Rep.Railsback); id. at H31541 (Rep.Poff); id. at H31549 (Rep.Giaimo); id. at H31555 (Rep.Eckhardt); id. at H31556 (Rep. Mikva); id. at H31560 (Rep.Lloyd); id. at H31565 (Rep.Edwards); id. at H31568 (Rep.Wyatt); id. at H31571-72 (Rep.Matsunaga); id. at H31573 (Rep.Johnson); id. at H31757 (Rep.Wright); id. at H31760 (Rep.Holifield); id. at H31770-71(Rep.Hansen); id. at H31772-73 (Rep. Anderson); id. at H31779 (Reps. Drinan and Pepper). Because the World War II detentions were authorized pursuant to the President's war making powers as well as by a congressional declaration of war and by additional congressional acts, see Endo, 323 U.S. at 285-90, 65 S.Ct. 208, the manifest congressional concern about these detentions also suggests that section 4001(a) limits military as well as civilian detentions.
 
 
 97
 Finally, a statement by Representative Eckhardt demonstrates that Congress intended to require its express authorization before the President could detain citizens. He said: "You have got to have an act of Congress to detain, and the act of Congress must authorize detention." Id. at H31555 (emphasis added). Based primarily on the plain language of the Non-Detention Act but also on its legislative history and the Supreme Court's interpretation, we conclude that the Act applies to all detentions and that precise and specific language authorizing the detention of American citizens is required to override its prohibition.
 
 
 98
 Despite its plain language, the government argues that section 4001(a) is intended to preclude only detentions by the Attorney General, not by the military. Its first argument is a constitutional one: to construe section 4001(a) to include military detentions would, in the government's view, risk construing it as an unconstitutional abridgement of the President's war powers. Its second argument is a statutory "placement" argument, which the government claims is supported in two ways. First, it contends that because section 4001(a) appears in a section governing the management of prisons, it does not constrain the President's war power. Second, it maintains that because section 4001(a) immediately precedes section 4001(b)(1), which vests authority to manage prisons in the Attorney General but specifically excludes military prisons from his purview, section 4001(a) must be read to exclude military detentions.
 
 
 99
 The District Court correctly declined to construe section 4001(a) to apply only to civilian detentions in order to avoid a construction of the statute that would unconstitutionally limit the President's war power. It held that the "doctrine of constitutional avoidance `has no application in the absence of statutory ambiguity.'" Padilla I, 233 F.Supp.2d at 597 (quoting HUD v. Rucker, 535 U.S. 125, 134, 122 S.Ct. 1230, 152 L.Ed.2d 258 (2002)). We agree. For the reasons discussed above, we have found that the statute is unambiguous. Moreover, this interpretation poses no risk of unconstitutionally abridging the President's war powers because, as we have also discussed above, the President, acting alone, possesses no inherent constitutional authority to detain American citizens seized within the United States, away from a zone of combat, as enemy combatants.[29]
 
 
 100
 Nor are we persuaded by the government's statutory placement argument. No accepted canon of statutory interpretation permits "placement" to trump text, especially where, as here, the text is clear and our reading of it is fully supported by the legislative history. While we, of course, as the government argues, read statutes as a whole to determine the most likely meaning of particular provisions or terms, this principle has no application here. Greater New York Metro. Food Council, Inc. v. Giuliani, 195 F.3d 100, 105 (2d Cir.1999). Section 4001(b)(1) was enacted many decades prior to the Emergency Detention Act as part of entirely different legislation. The government points to nothing suggesting the two subsections share a common origin or meaning rather than simply a common code designation. In any event, reliance on subsection (b)(1) suggests a conclusion opposite to the one the government proposes. Subsection (b)(1) provides: The control and management of Federal penal and correctional institutions, except military or naval institutions, shall be vested in the Attorney General, who shall promulgate rules for the government thereof, and appoint all necessary officers and employees in accordance with the civil-service laws, the Classification Act, as amended and the applicable regulations.
 
 
 101
 18 U.S.C. § 4001(b)(1). In subsection (b)(1), Congress explicitly distinguished between military and civilian jurisdiction by authorizing the Attorney General to control all prisons except military institutions. The lack of any such distinction in subsection (a) suggests that none exists and that the Non-Detention Act applies to both civilian and military detentions.
 
 
 102
 
 b. Specific Statutory Authorization
 
 
 
 103
 Since we conclude that the Non-Detention Act applies to military detentions such as Padilla's, we would need to find specific statutory authorization in order to uphold the detention. The government claims that both the Joint Resolution, which authorized the use of force against the perpetrators of the September 11 terrorist attacks, and 10 U.S.C. § 956(5), passed in 1984, which provides funding for military detentions, authorize the detention of enemy combatants. It is with respect to the Joint Resolution that we disagree with the District Court, which held that the Joint Resolution must be read to confer authority for Padilla's detention. It found that the "language [of the Joint Resolution] authorizes action against not only those connected to the subject organizations who are directly responsible for the September 11 attacks, but also against those who would engage in `future acts of international Terrorism' as part of `such... organizations.'" Padilla I, 233 F.Supp.2d at 598-99.
 
 
 104
 We disagree with the assumption that the authority to use military force against these organizations includes the authority to detain American citizens seized on American soil and not actively engaged in combat. First, we note that the Joint Resolution contains no language authorizing detention. It provides:[30]
 
 
 105
 That the President is authorized to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons.
 
 
 106
 Joint Resolution § 2(a).
 
 
 107
 Because the government seeks to read into the Joint Resolution authority to detain American citizens on American soil, we interpret its language in light of the principles enunciated in Ex parte Endo, 323 U.S. at 298-300, 65 S.Ct. 208. The Endo Court first recognized that "the Constitution when it committed to the Executive and to Congress the exercise of the war power necessarily gave them wide scope for the exercise of judgment and discretion so that war might be waged effectively and successfully." Id. at 298-99, 65 S.Ct. 208. It then said: "At the same time, however, the Constitution is as specific in its enumeration of many of the civil rights of the individual as it is in its enumeration of the powers of his government. Thus it has prescribed procedural safeguards surrounding the arrest, detention and conviction of individuals." Id. at 299, 65 S.Ct. 208. Therefore, the Court held: "[i]n interpreting a war-time measure we must assume that [the purpose of Congress and the Executive] was to allow for the greatest possible accommodation between those liberties and the exigencies of war." Id. at 300, 65 S.Ct. 208. The Court added: "We must assume, when asked to find implied powers in a grant of legislative or executive authority, that the law makers intended to place no greater restraint on the citizen than was clearly and unmistakably indicated by the language they used." Id. (emphasis added).
 
 
 108
 The plain language of the Joint Resolution contains nothing authorizing the detention of American citizens captured on United States soil, much less the express authorization required by section 4001(a) and the "clear," "unmistakable" language required by Endo. While it may be possible to infer a power of detention from the Joint Resolution in the battlefield context where detentions are necessary to carry out the war, there is no reason to suspect from the language of the Joint Resolution that Congress believed it would be authorizing the detention of an American citizen already held in a federal correctional institution and not "arrayed against our troops" in the field of battle. Hamdi III, 316 F.3d at 467.[31]
 
 
 109
 Further, the Joint Resolution expressly provides that it is "intended to constitute specific statutory authorization within the meaning of ... the War Powers Resolution." Joint Resolution § 2(b); 50 U.S.C. § 1541 et seq. The War Powers Resolution requires the President to cease military operations within 60 days unless Congress has declared war or specifically authorized the use of the armed forces. 50 U.S.C. § 1544(b). It is unlikely — indeed, inconceivable — that Congress would expressly provide in the Joint Resolution an authorization required by the War Powers Resolution but, at the same time, leave unstated and to inference something so significant and unprecedented as authorization to detain American citizens under the Non-Detention Act.
 
 
 110
 Next, the Secretary argues that Padilla's detention is authorized by 10 U.S.C. § 956(5), which allows the use of appropriated funds for "expenses incident to the maintenance, pay, and allowances of prisoners of war, other persons in the custody of the Army, Navy or Air Force whose status is determined by the Secretary concerned to be similar to prisoners of war, and persons detained in the custody of [the Armed Services] pursuant to Presidential proclamation." 10 U.S.C. § 956(5). The Fourth Circuit found that section 956(5) along with the Joint Resolution sufficed to authorize Hamdi's detention. Hamdi III, 316 F.3d at 467-68. With respect to Section 956(5), the court said: "It is difficult if not impossible to understand how Congress could make appropriations for the detention of persons `similar to prisoners of war' without also authorizing their detention in the first instance." Id.
 
 
 111
 At least with respect to American citizens seized off the battlefield, we disagree. Section 965(5) authorizes nothing beyond the expenditure of money. Endo unquestionably teaches that an authorization of funds devoid of language "clearly" and "unmistakably" authorizing the detention of American citizens seized here is insufficient. See 323 U.S. at 303 n. 24, 65 S.Ct. 208 (acknowledging that Congress may ratify past actions of the Executive through appropriations acts but refusing to find in the appropriations acts at issue an intent to allow the Executive to detain a citizen indefinitely because the appropriation did not allocate funds "earmarked" for that type of detention). In light of Endo, the Non-Detention Act's requirement that Congress specifically authorize detentions of American citizens, and the guarantees of the Fourth and Fifth Amendments to the Constitution, we decline to impose on section 956(5) loads it cannot bear.
 
 CONCLUSION
 
 112
 In sum, we hold that (1) Donna Newman, Esq., may pursue habeas relief on behalf of Jose Padilla; (2) Secretary of Defense Rumsfeld is a proper respondent to the habeas petition and the District Court had personal jurisdiction over him; (3) in the domestic context, the President's inherent constitutional powers do not extend to the detention as an enemy combatant of an American citizen seized within the country away from a zone of combat; (4) the Non-Detention Act prohibits the detention of American citizens without express congressional authorization; and (5) neither the Joint Resolution nor 10 U.S.C. § 956(5) constitutes such authorization under section 4001(a). These conclusions are compelled by the constitutional and statutory provisions we have discussed above. The offenses Padilla is alleged to have committed are heinous crimes severely punishable under the criminal laws. Further, under those laws the Executive has the power to protect national security and the classified information upon which it depends. See, e.g., 18 U.S.C. app. § 3. And if the President believes this authority to be insufficient, he can ask Congress — which has shown its responsiveness — to authorize additional powers. To reiterate, we remand to the District Court with instructions to issue a writ of habeas corpus directing the Secretary of Defense to release Padilla from military custody within 30 days. The government can transfer Padilla to appropriate civilian authorities who can bring criminal charges against him. Also, if appropriate, Padilla can be held as a material witness in connection with grand jury proceedings. In any case, Padilla will be entitled to the constitutional protections extended to other citizens.
 
 APPENDIX A
 TO THE SECRETARY OF DEFENSE:
 
 113
 Based on the information available to me from all sources,
 
 REDACTED
 
 114
 In accordance with the Constitution and consistent with the laws of the United States, including the Authorization for Use of Military Force Joint Resolution (Public Law 107-40);
 
 
 115
 I, GEORGE W. BUSH, as President of the United States and Commander in Chief of the U.S. armed forces, hereby DETERMINE for the United States of America that: (1) Jose Padilla, who is under the control of the Department of Justice and who is a U.S. citizen, is, and at the time he entered the United States in May 2002 was, an enemy combatant;
 
 
 116
 (2) Mr. Padilla is closely associated with al Qaeda, an international terrorist organization with which the United States is at war;
 
 
 117
 (3) Mr. Padilla engaged in conduct that constituted hostile and war-like acts, including conduct in preparation for acts of international terrorism that had the aim to cause injury to or adverse effects on the United States;
 
 
 118
 (4) Mr. Padilla possesses intelligence, including intelligence about personnel and activities of al Qaeda, that, if communicated to the U.S., would aid U.S. efforts to prevent attacks by al Qaeda on the United States or its armed forces, other governmental personnel, or citizens;
 
 
 119
 (5) Mr. Padilla represents a continuing, present and grave danger to the national security of the United States, and detention of Mr. Padilla is necessary to prevent him from aiding al Qaeda in its efforts to attack the United States or its armed forces, other governmental personnel, or citizens;
 
 
 120
 (6) it is in the interest of the United States that the Secretary of Defense detain Mr. Padilla as an enemy combatant; and
 
 
 121
 (7) it is REDACTED consistent with U.S. law and the laws of war for the Secretary of Defense to detain Mr. Padilla as an enemy combatant.
 
 
 122
 Accordingly, you are directed to receive Mr. Padilla from the Department of Justice and to detain him as an enemy combatant.
 
 APPENDIX B
 Joint Resolution
 
 123
 To authorize the use of United States Armed Forces against those responsible for the recent attacks launched against the United States.
 
 
 124
 Whereas, on September 11, 2001, acts of treacherous violence were committed against the United States and its citizens; and
 
 
 125
 Whereas, such acts render it both necessary and appropriate that the United States exercise its rights to self-defense and to protect United States citizens both at home and abroad; and
 
 
 126
 Whereas, in light of the threat to the national security and foreign policy of the United States posed by these grave acts of violence; and
 
 
 127
 Whereas, such acts continue to pose an unusual and extraordinary threat to the national security and foreign policy of the United States; and
 
 
 128
 Whereas, the President has authority under the Constitution to take action to deter and prevent acts of international terrorism against the United States: Now, therefore, be it
 
 
 129
 Resolved by the Senate and House of Representatives of the United States of America in Congress assembled,
 
 
 130
 SECTION 1. SHORT TITLE.
 
 
 131
 This joint resolution may be cited as the "Authorization for Use of Military Force."
 
 
 132
 SEC. 2. AUTHORIZATION FOR USE OF UNITED STATES ARMED FORCES.
 
 
 133
 (a) IN GENERAL. — That the President is authorized to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons.
 
 
 134
 (b) WAR POWERS RESOLUTION REQUIREMENTS. —
 
 
 135
 (1) SPECIFIC STATUTORY AUTHORIZATION. — Consistent with section 8(a)(1) of the War Powers Resolution, the Congress declares that this section is intended to constitute specific statutory authorization within the meaning of section 5(b) of the War Powers Resolution.
 
 
 136
 (2) APPLICABILITY OF OTHER REQUIREMENTS. — Nothing in this resolution supercedes any requirement of the War Powers Resolution.
 
 
 
 Notes:
 
 
 [1]
 Therefore, our holding effectively moots arguments raised by both parties concerning access to counsel, standard of review, and burden of proof
 
 
 [2]
 These details should not be read to suggest that Padilla is in fact innocent or that the government lacked substantial reasons to be suspicious of him. We include them because they are relevant to our analysis of the President's power to detain Padilla as an enemy combatant. As is evident from the government investigation, described below, the government had ample cause to suspect Padilla of involvement in a terrorist plot. We, of course, reach no conclusion as to Padilla's guilt or innocence
 
 
 [3]
 The full text of the President's Order is set forth in Appendix A
 
 
 [4]
 Prior to oral argument, we reviewed the sealed Mobbs declaration as well as a sealed declaration of Vice Admiral Lowell E. Jacoby, the Director of the Defense Intelligence Agency, which was submitted to the District Court in connection with Secretary Rumsfeld's motion for reconsideration. Nothing in the ensuing discussion or holdings relies on either of these sealed documents
 
 
 [5]
 Twelve amici submitted briefs in support of Petitioner and one in support of Respondent. Almost all of these briefs have been helpful to us. We particularly appreciate the amici's care in emphasizing different issues and thus eliminating much of the redundancy that would otherwise exist. At oral argument on November 17, 2003, we requested post-argument submissions concerning the legislative history of the congressional acts urged to be dispositive of this case. These submissions were received by the Clerk's office on November 28, 2003, and by chambers on December 2, 2003
 
 
 [6]
 The District Court characterized its finding that Newman could act as next friend as "a ruling that I cannot imagine will be open to serious question."Padilla III, 256 F.Supp.2d at 221. While the Order certifying this matter for interlocutory appeal did not certify the next friend issue, this Court "may address any issue fairly included within the certified order" because "it is the order that is appealable, and not the controlling question identified by the district court." Yamaha Motor Corp., U.S.A. v. Calhoun, 516 U.S. 199, 205, 116 S.Ct. 619, 133 L.Ed.2d 578 (1996) (internal quotation marks and citation omitted).
 
 
 [7]
 Whether a person seeking next friend status must have a "significant relationship" to the petitioner has not been resolved by this Court or by the Supreme Court. The Supreme Court merely said that "it has been further suggested that a `next friend' must have some significant relationship with the real party in interest."Whitmore, 495 U.S. at 163-64, 110 S.Ct. 1717. In the ensuing discussion, we assume — without holding — that there is a significant relationship requirement for next friend status.
 
 
 [8]
 The facts of this case distinguish it fromHamdi v. Rumsfeld, 294 F.3d 598 (2002) ("Hamdi I"), and Coalition of Clergy, Lawyers, and Professors v. Bush, 310 F.3d 1153 (9th Cir.2002), cert. denied, ___ U.S. ___, 123 S.Ct. 2073, 155 L.Ed.2d 1060 (2003), on which the government relies. In both of those cases, the putative next friends had no relationship with the petitioner. Hamdi I, 294 F.3d at 606-607; Coalition of Clergy, 310 F.3d at 1162.
 
 
 [9]
 Other courts have rejected this argument. InEisel v. Sec'y of the Army, 477 F.2d 1251 (D.C.Cir.1973), a case involving an inactive reservist, the court stated:
 [W]hile the statute does provide that the action shall be against the "person having custody of the person detained," it does not define "custody" or specify who the person having "custody" will be. Nowhere does the statute speak of an "immediate custodian" or intimate that an action must necessarily be instituted in the location of such an "immediate custodian," even if it were possible to grant substance to the vague concept of "immediate custodianship."
 Id. at 1258 (footnotes omitted).
 
 
 [10]
 The only exceptions involve limited circumstances where prisoners are held abroad with no domestic forum available or where the prisoner is being held at an undisclosed locationSee Demjanjuk v. Meese, 784 F.2d 1114, 1115-16 (D.C.Cir.1986).
 
 
 [11]
 Four years later inAhrens v. Clark, 335 U.S. 188, 68 S.Ct. 1443, 92 L.Ed. 1898 (1948), the Supreme Court was again confronted with the issue. Ahrens involved habeas petitions brought by German immigrants detained on Ellis Island under removal orders issued by the Attorney General. The petitions named the Attorney General as sole respondent. The Ahrens Court determined the petitions had to be dismissed because the detainees had not filed petitions in the district court for the district in which they were confined. Id. at 193, 68 S.Ct. 1443. In so holding, Ahrens left open the question of whether the Attorney General, under whose removal orders and "custody and control" the aliens were detained, could be a proper respondent to the petitions. Id. at 189, 193, 68 S.Ct. 1443.
 
 
 [12]
 In betweenEndo and Strait, the Court also decided Schlanger v. Seamans, 401 U.S. 487, 91 S.Ct. 995, 28 L.Ed.2d 251 (1971), which addressed a habeas petition filed by a United States soldier temporarily studying at Arizona State University but under the control of military officers at Moody Air Force Base ("Moody AFB") in Georgia. Schlanger filed a petition in Arizona district court alleging his enlistment contract had been breached and his freedom was being unlawfully restricted by the military. The petition named the Secretary of the Air Force, the Commander of Moody AFB, and the Commander of ROTC on Arizona State University's campus as respondents. In reaching its conclusion that the Commander of Moody AFB was Schlanger's custodian and outside the reach of the territorial jurisdiction of the Arizona district court, the Court did not discuss whether the Secretary of the Air Force might be both within the court's jurisdiction and a proper respondent. In our opinion, by this omission and the Court's emphasis on the Commander at Moody as an essential party, Schlanger suggested that the proper respondent is the person who exercises the power to limit petitioner's liberty.
 
 
 [13]
 A number of courts have embraced this approach. For example, inArmentero v. INS, 340 F.3d 1058 (9th Cir.2003), the Ninth Circuit held that the Attorney General was the proper respondent to an immigration habeas petition, citing the necessity to base the concept of "custodian" for the purpose of habeas relief "more on the legal reality of control than the technicalities of who administers [to petitioner] on a day-to-day basis." Id. at 1070. Although we acknowledge the circuit split regarding the propriety of designating the Attorney General as the habeas respondent to an immigrant's petition, e.g., Vasquez v. Reno, 233 F.3d 688, 696 (1st Cir.2000) (holding that the Attorney General was not a proper respondent), as well as our own Court's reluctance to reach the question, see Henderson v. INS, 157 F.3d 106, 128 (2d Cir.1998), cert. denied, 526 U.S. 1004, 119 S.Ct. 1141, 143 L.Ed.2d 209 (1999), we are satisfied that the unique involvement of Secretary Rumsfeld distinguishes this case from the typical immigrant petition.
 
 
 [14]
 Braden overruled, in part, the Court's earlier decision in Ahrens that a habeas petition could only be filed in a court sitting within the district in which the petitioner is confined. See supra note 11; see also infra Section I.B.ii.
 
 
 [15]
 In addition to the cases we already have cited, prisoners in other Supreme Court cases have named someone other than their immediate custodian as the respondentSee Garlotte v. Fordice, 515 U.S. 39, 42, 115 S.Ct. 1948, 132 L.Ed.2d 36 (1995) (respondent named by an incarcerated prisoner was the governor of the state and not the prison warden); Toth v. Quarles, 350 U.S. 11, 76 S.Ct. 1, 100 L.Ed. 8 (1955) (Secretary of the Air Force named as respondent by ex-service member in military custody in Korea); Burns v. Wilson, 346 U.S. 137, 73 S.Ct. 1045, 97 L.Ed. 1508 (1953) (Secretary of Defense named as respondent by service member held in military custody in Guam). Although these cases do not analyze the propriety of naming a high level official rather than an immediate physical custodian as the respondent, they certainly suggest that there is no inflexible rule that the immediate custodian is the only proper respondent.
 
 
 [16]
 WhileBraden is clearly about the jurisdiction of the court, its resolution rests in part on determining the proper custodian/respondent. Recognizing the overlap and interrelationship of these issues, it is important to note we must first determine if Secretary Rumsfeld is a proper respondent. The jurisdictional analysis logically follows thereafter.
 
 
 [17]
 Moreover, circumstances we foresaw inBilliteri v. United States Board of Parole, 541 F.2d 938 (2d Cir.1976), indicate Secretary Rumsfeld is an appropriate respondent in this case. Billiteri held that the Board of Parole is not an appropriate respondent in habeas petitions involving prisoners seeking early parole. Id. at 948. Nevertheless, Billiteri also noted the possibility that "when the Board itself has caused a parolee to be detained for violation of his parole," the parole board may qualify as a custodian for habeas purposes. Id. (emphasis added). Here, Secretary Rumsfeld by his own actions and decisions caused Padilla to be detained.
 
 
 [18]
 Secretary Rumsfeld argues only that long-arm jurisdiction is inapplicable in the habeas context. He does not argue that section 302(a)(1) does not reach his activities in this state. We choose to address this issue because neither the courts of this circuit nor the New York courts have had an opportunity to examine the application of section 302(a)(1) in this unusual context
 
 
 [19]
 The term "transacts any business" has been held to include: engaging in active bidding on an open phone line from California,Parke-Bernet, 26 N.Y.2d at 19, 308 N.Y.S.2d 337, 256 N.E.2d 506; the conducting of proceedings and disciplinary hearings on membership by a private organization, Garofano v. U.S. Trotting Assoc., 78 Misc.2d 33, 355 N.Y.S.2d 702, 705-06 (Sup.Ct.1974); the execution of a separation agreement, Kochenthal v. Kochenthal, 28 A.D.2d 117, 282 N.Y.S.2d 36, 38 (N.Y.App.Div.1967); the making of a retainer for legal services, Elman v. Belson, 32 A.D.2d 422, 302 N.Y.S.2d 961, 964-65 (1969); the entry into New York by nondomiciliary defendants to attend a meeting, Parker v. Rogerson, 33 A.D.2d 284, 307 N.Y.S.2d 986, 994-95 (N.Y.App.Div.1970), appeal dismissed, 26 N.Y.2d 964, 311 N.Y.S.2d 7, 259 N.E.2d 479 (1970); and the conducting of audits, U.S. Steel Corp. v. Multistate Tax Comm'n, 367 F.Supp. 107, 121 (S.D.N.Y. 1973).
 
 
 [20]
 Although not relevant to the resolution of this case, it is important to note that in setting forth certain bases of permitted activity for long-arm jurisdiction, section 302 does not reach the outposts of constitutionally permitted activitySee Banco Ambrosiano, S.P.A. v. Artoc Bank & Trust Ltd., 62 N.Y.2d 65, 67, 476 N.Y.S.2d 64, 464 N.E.2d 432 (1984). Thus, a situation could occur in which the necessary contacts to satisfy due process are present, but in personam jurisdiction is not obtained in New York because the statute does not authorize it. See Seigel, N.Y. Prac., § 85, at 137 (3d. ed.1999).
 
 
 [21]
 Although the complained of action in this case is not the signing of the June 9 Order, it is nonetheless relevant given its charge to Secretary Rumsfeld
 
 
 [22]
 Similarly, we believe personal jurisdiction over Secretary Rumsfeld comports with due processSee Asahi Metal Indus. Co., Ltd. v. Superior Court of California, 480 U.S. 102, 113, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987). We believe that requiring Secretary Rumsfeld to litigate this matter in the Southern District of New York imposes no significant burden upon him — and, indeed, is most convenient for the parties — especially given the fact that this case has, for the last 18 months, been actively litigated in this district.
 
 
 [23]
 The full text of the Third Amendment states: "No Soldier shall, in time of peace be quartered in any house, without the consent of the Owner, nor in time of war, but in a manner to be prescribed by law." U.S. Const. amend. III
 
 
 [24]
 The dissent misreads us to suggest that the President has no power to deal with imminent acts of belligerency on U.S. soil outside a zone of combat and absent express authorization from CongressSee infra at [729]. We make no such claim. As we have discussed, criminal mechanisms exist for dealing with such situations. We only hold that the President's Commander-in-Chief powers do not encompass the detention of a United States citizen as an enemy combatant taken into custody on United States soil outside a zone of combat.
 
 
 [25]
 The dissent argues that Quirin located the President's authority to try the saboteurs before a military tribunal, in part, on his powers as Commander-in-Chief. 317 U.S. at 28, 63 S.Ct. 1. However, the Court clearly viewed the statutory basis as the primary ground for the imposition of military jurisdiction, and regarded any inherent executive authority, if indeed it existed, as secondary: "By his Order creating the present Commission [the President] has undertaken to exercise the authority conferred upon him by Congress, and also such authority as the Constitution itself gives the Commander in Chief...."Id. The Court certainly did not find the President's Commander-in-Chief powers independently sufficient to authorize such military commissions. In fact, as noted above, the Court explicitly declined to reach this question.
 
 
 [26]
 The government relies heavily on the factual parallels between theQuirin saboteurs and Padilla. Similar to the Quirin saboteurs, Padilla allegedly traveled overseas to Afghanistan and Pakistan, where he engaged in extended discussions with senior al Qaeda operatives about conducting hostile operations within the United States. Padilla is also alleged to have received explosives training and to have returned to the United States to advance prospective al Qaeda attacks against this country. We are not persuaded by these factual parallels that the President can act to place citizens in military detention absent congressional authorization because the Quirin Court relied on such authorization to justify the detention and military trial of the Quirin saboteurs, an authorization that we believe is lacking here.
 
 
 [27]
 The dissent expresses deep concern that our holding means that the President lacks inherent authority to detain a terrorist in the face of imminent attack. The President's authority to detain such a person is not an issue raised by this case. The dissent's concerns overlook the fact that Padilla was detained by the military while a maximum security inmate at the MCC. Thus, issues concerning imminent danger simply do not arise in this case
 
 
 [28]
 Railsback and Ichord's shared view of the scope of the Non-Detention Act was echoed by another opponent of the billSee, e.g., id. at 31554 (Representative Williams stating that "I do not want to see the President's hands tied by the language of the [Railsback] proposal which would require an Act of Congress before any likely subversive or would-be saboteur could be detained"). However, another opponent of the bill and member of the Internal Security Committee argued that even with the Railsback amendment, the President could declare a national emergency and act to detain citizens using his inherent powers. See id. at 31547 (remarks of Representative Ashbrook). We address the President's inherent powers supra at Section II.B.ii.
 
 
 [29]
 If the President's Commander-in-Chief powers were plenary in the context of a domestic seizure of an American citizen, the government's argument that the legislature could not constitutionally prohibit the President from detaining citizens would have some forceCf. Hamdi III, 316 F.3d at 468 (stating that "§ 4001(a) functioned principally to repeal the Emergency Detention Act [which] had provided for the preventive `apprehension and detention' of individuals inside the United States `deemed likely to engage in espionage or sabotage' during `internal security emergencies'" and that "[t]here is no indication that § 4001(a) was intended to overrule the longstanding rule that an armed and hostile American citizen captured on the battlefield during wartime may be treated like the enemy combatant that he is" (quoting H.R.Rep. No. 92-116, at 2 (1971)) (emphases added)). In view of the plain language of the Act, it might have been preferable to hold that Congress could not intrude on the President's Commander-in-Chief power on the battlefield rather than to interpret the Act as the Fourth Circuit did. We do not have to reach that issue, however. As we have previously noted, Judge Wilkinson, one of the authors of Hamdi III, remarked in his later concurrence to the decision not to rehear Hamdi III en banc that "[t]o compare this battlefield capture to the domestic arrest in Padilla v. Rumsfeld is to compare apples and oranges." Hamdi IV, 337 F.3d at 344.
 
 
 [30]
 The full text of the resolution is set forth in Appendix A
 
 
 [31]
 The debates on the Joint Resolution are at best equivocal as to the President's powers and never mention the issue of detention. Therefore, even assuming they could overcome the lack of a specific grant to the President, they do not suggest that Congress authorized the detention of United States citizens captured on United States soil. Some legislators believed the President's authority was strictly limitedSee, e.g., 147 Cong. Rec. H5639 (Rep. Lantos: "to bring to bear the full force of American power abroad"). Supporters of the President's power argued that it was too limited. See, e.g., id. at H5653 (Rep. Barr arguing that in addition to the joint resolution, Congress should declare war to "[g]ive the President the tools, the absolute flexibility he needs under international law and The Hague Convention to ferret these people out wherever they are, however he finds them, and get it done as quickly as possible"); id. at H5654 (Rep. Smith: "This resolution should have authorized the President to attack, apprehend, and punish terrorists whenever it is in the best interests of America to do so. Instead, the resolution limits the President to using force only against those responsible for the terrorist attacks last Tuesday. This is a significant restraint on the President's ability to root out terrorism wherever it may be found.")
 
 
 
 137
 WESLEY, Circuit Judge, concurring in part, dissenting in part.
 
 
 138
 I respectfully dissent from that aspect of the majority's opinion that concludes the President is without authority from Congress or the Constitution to order the detention and interrogation of Mr. Padilla.[1] In my view, the President as Commander in Chief has the inherent authority to thwart acts of belligerency at home or abroad that would do harm to United States citizens. But even if Mr. Padilla's status as a United States citizen on United States soil somehow changes the constitutional calculus, I cannot see how the Non-Detention Act precludes an affirmance.
 
 
 139
 Because I would affirm the thoughtful and thorough decision of Chief Judge Mukasey, a brief examination of his opinion is appropriate. After examining the President's inherent powers under the Constitution, as explained in Amy Warwick, 67 U.S. (2 Black) 635, 17 L.Ed. 459 (1862) ("The Prize Cases"), and subsequent case law, the district court held Padilla's detention is not unlawful, as the President is authorized under the Constitution to repel belligerent acts that threaten the safety of United States citizens. The court also held that the detention is authorized by Congress' Authorization for Use of Military Force, Pub.L. No. 107-40, 115 Stat. 224 (2001) ("Joint Resolution"). Chief Judge Mukasey noted that 18 U.S.C. § 4001(a) did not preclude this result in that the Joint Resolution identified a specific group of belligerents.
 
 
 140
 Relying on the Third Geneva Convention, the district court examined the distinction between lawful and unlawful combatants and ultimately concluded that either could be detained. See Padilla ex rel. Newman v. Bush, 233 F.Supp.2d 564, 594-95 (S.D.N.Y.2002). The court concluded that the President's ability to detain Padilla as an unlawful enemy combatant was not altered by Padilla's citizenship. See id. at 594 (citing Ex Parte Quirin, 317 U.S. 1, 63 S.Ct. 1, 87 L.Ed. 3 (1942)). The court distinguished Ex Parte Milligan, 71 U.S. (4 Wall.) 2, 18 L.Ed. 281 (1866), by noting that the citizens in Milligan were neither part of, nor associated with, the armed forces of the Confederacy. See id. Thus, they were not enemy combatants subject to the laws of war.
 
 
 141
 Much of Chief Judge Mukasey's work is not the focus of the majority's analytical resolution of this case. I offer that not as a criticism but merely as a note of limitation. Our task here is confined to the interplay between the President's Article II responsibilities as Commander in Chief and the authority of Congress to regulate domestic activity, even in a time of war, pursuant to Article I of the Constitution.
 
 
 142
 My disagreement with the majority is two-fold. In my view, the President, as Commander in Chief, has inherent authority to thwart acts of belligerency on U.S. soil that would cause harm to U.S. citizens, and, in this case, Congress through the Joint Resolution specifically and directly authorized the President to take the actions herein contested. The majority concludes the President is without inherent authority to detain Padilla. They agree that "great deference is afforded the President's exercise of his authority as Commander-in-Chief," Maj. at 712 (citing Dep't of the Navy v. Egan, 484 U.S. 518, 530, 108 S.Ct. 818, 98 L.Ed.2d 918 (1988)), and concede the judiciary has no authority to determine the political question of whether the nation is at war. Id. They recognize that the President and Congress often work cooperatively during times of armed conflict. However, the majority contends that separation of powers concerns are heightened when the President's powers are exercised in the "domestic sphere" and that Congress, not the Executive, controls utilization of war powers when invoked as an instrument of domestic policy. Maj. at 713.
 
 
 143
 It is true that Congress plays the primary role in domestic policy even in a time of war. Congress does have the power to define and punish offenses committed on U.S. soil, see U.S. CONST. art. I, § 8, cl. 10, to suspend the Writ of Habeas Corpus, see U.S. CONST. art. I, § 9, cl. 2, and to determine when and if soldiers are to be quartered in private homes during a time of war, see U.S. CONST. amend. III. But none of those powers are in question here nor does the majority cite a specific constitutional provision in which Congress is given exclusive constitutional authority to determine how our military forces will deal with the acts of a belligerent on American soil. There is no well traveled road delineating the respective constitutional powers and limitations in this regard.
 
 
 144
 The majority relies on Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952), as its analytical guide in determining the President's constitutional authority in this matter. However, this is a different case. In Youngstown, the Supreme Court was confronted with two opposing claims of constitutional authority. The President argued he had the authority to seize the steel mills in question by virtue of his constitutional responsibilities as Commander in Chief and as Chief Executive. Id. at 582, 72 S.Ct. 863. The President contended that a steady supply of steel was necessary to sustain the war effort in Korea. See id. at 582-83, 72 S.Ct. 863. The steel mills argued that at its core the dispute was a labor matter — an area clearly reserved for congressional regulation. See id. at 582, 72 S.Ct. 863. The Court sided with the steel mills, id. at 589, 72 S.Ct. 863, and with good reason — the President's attempt to link the seizure to prosecuting the war in Korea was far too attenuated. In this case the President's authority is directly tied to his responsibilities as Commander in Chief.
 
 
 145
 In The Prize Cases the Supreme Court rejected a challenge to the President's authority to impose a blockade on the secessionist states absent a declaration of war. See 67 U.S. at 668, 67 U.S. 635. As I read The Prize Cases, it is clear that common sense and the Constitution allow the Commander in Chief to protect the nation when met with belligerency and to determine what degree of responsive force is necessary. See id. at 669-70, 67 U.S. 635. The President has "no power to initiate or declare a war" but "[i]f a war be made by invasion ..., the President is not only authorized but bound to resist force by force. He ... is bound to accept the challenge without waiting for any special legislative authority." Id. at 668, 67 U.S. 635. Regardless the title given the force, the President, in fulfilling his duties as Commander in Chief to suppress insurrection and to deal with belligerents aligned against the nation, is entitled to determine the appropriate response. See id. at 669-70, 67 U.S. 635.
 
 
 146
 In reaching this conclusion the Court noted the President's decision regarding the level of force necessary is a political not a judicial decision. Id. at 670, 67 U.S. 635. Thus, as courts have previously recognized, The Prize Cases stands "for the proposition that the President has independent authority to repel aggressive acts by third parties even without specific congressional authorization, and courts may not review the level of force selected." Campbell v. Clinton, 203 F.3d 19, 27 (D.C.Cir.2000) (Silberman, J., concurring); see also Padilla, 233 F.Supp.2d at 589. "[T]he authority to decide whether the exigency has arisen, belongs exclusively to the President, and ... his decision is conclusive upon all other persons." Martin v. Mott, 25 U.S. (12 Wheat.) 19, 30, 6 L.Ed. 537 (1827).[2] The Prize Cases demonstrates that congressional authorization is not necessary for the Executive to exercise his constitutional authority to prosecute armed conflicts when, as on September 11, 2001, the United States is attacked.
 
 
 147
 My colleagues appear to agree with this premise but conclude that somehow the President has no power to deal with acts of a belligerent on U.S. soil "away from a zone of combat" absent express authorization from Congress. Maj. at 698, 712, 721. That would seem to imply that the President does have some war power authority to detain a citizen on U.S. soil if the "zone of combat" was the United States. The majority does not tell us who has the authority to define a "zone of combat" or to designate a geopolitical area as such. Given the majority's view that "the Constitution lodges ... [inherent national emergency powers] with Congress, not the President," Maj. at 714, it would seem that the majority views this responsibility as also the singular province of Congress. That produces a startling conclusion. The President would be without any authority to detain a terrorist citizen dangerously close to a violent or destructive act on U.S. soil unless Congress declared the area in question a zone of combat or authorized the detention. Curiously, even Mr. Padilla's attorney conceded that the President could detain a terrorist without Congressional authorization if the attack were imminent. See Oral Argument Tr. at 51.
 
 
 148
 But the scope of the President's inherent war powers under Article II does not end the matter, for in my view Congress clearly and specifically authorized the President's actions here.[3] As Chief Judge Mukasey noted, the Joint Resolution, passed by both houses of Congress, "authorizes the President to use necessary and appropriate force in order, among other things, `to prevent any future acts of international terrorism against the United States,' and thereby engages the President's full powers as Commander in Chief." Padilla, 233 F.Supp.2d at 590 (quoting Pub.L. No. 107-40, 115 Stat. 224); cf. Quirin, 317 U.S. at 29, 63 S.Ct. 1 (finding it "unnecessary for present purposes to determine to what extent the President as Commander in Chief has constitutional power ... [f]or here Congress has authorized [his actions]"). Youngstown fully supports that view. "When the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate." 343 U.S. at 635, 72 S.Ct. 863 (Jackson, J., concurring) (emphasis added). The Joint Resolution authorized the President to take the action herein challenged; his powers were at their apogee.
 
 
 149
 Following the attacks of 9-11, the President declared a national emergency. See 50 U.S.C. § 1541(c)(3) (2003). On September 18, 2001, Congress passed Public Law 107-40 as a joint resolution. Pub.L. No. 107-40, 115 Stat. 224. That resolution, entitled "Authorization for Use of Military Force," notes the "acts of treacherous violence committed against the United States and its citizens," and the danger those acts posed to national security. Id. Moreover, the resolution recognizes "the President has authority under the Constitution to take action to deter and prevent acts of international terrorism against the United States." Id. (emphasis added). It provides:
 
 
 150
 That the President is authorized to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons.
 
 
 151
 Pub.L. No. 107-40, § 2(a), 115 Stat. 224, 224.[4] Some of the belligerents covered by the Joint Resolution are not nation states, they have no armies in the traditional sense — their "membership" consists of "soldiers" who rely on subterfuge and surprise. Congress recognized that these organizations are waging a war different from any our nation has faced. It authorized the President to employ the necessary and appropriate force to prevent future terrorist attacks.
 
 
 152
 It is quite clear from the President's Order of June 9, 2002 that Mr. Padilla falls within the Joint Resolution's intended sweep. Appendix A at 724-25. As relevant here, the Joint Resolution authorizes the President (1) to use appropriate and necessary force — detention would seem to be an appropriate level of force in Mr. Padilla's situation, (2) against those organizations that planned, authorized, or committed the terrorist attacks of 9-11 — none of us disputes al Qaeda is responsible for the carnage of that day, (3) in order to prevent future attacks of terrorism against the United States — Padilla is alleged to be closely associated with an al Qaeda plan to carry out an attack in the United States[5] and to possess information that if obtained by the U.S. would prevent future terrorist attacks.
 
 
 153
 The Joint Resolution has limits; it applies only to those subsets of persons, organizations and nations "[the President] determines planned, authorized, committed, or aided the terrorist attacks." Pub.L. No. 107-40, 115 Stat. 224. The President is not free to detain U.S. citizens who are merely sympathetic to al Qaeda.[6] Nor is he broadly empowered to detain citizens based on their ethnic heritage. Rather, the Joint Resolution is a specific and direct mandate from Congress to stop al Qaeda from killing or harming Americans here or abroad.[7] The Joint Resolution is quite clear in its mandate. Congress noted that the 9-11 attacks made it "both necessary and appropriate that the United States exercise its rights to self-defense and to protect Unites States citizens both at home and abroad." Id. It seems clear to me that Congress understood that in light of the 9-11 attacks the United States had become a zone of combat.
 
 
 154
 Organizations such as al Qaeda are comprised of people. Congress could not have intended to limit the President's authority to only those al Qaeda operatives who actually planned or took part in 9-11. That would do little to prevent future attacks. The fate of the participants is well known. And surely Congress did not intend to limit the President to pursue only those individuals who were al Qaeda operatives as of September 11, 2001. But even if it did, Mr. Padilla fits within the class for by September of 2001, he had already been under the tutelage and direction of senior al Qaeda officers for three years. Clearly, Congress recognized that al Qaeda and those who now do its bidding are a continuing threat to the United States. Thus, the Joint Resolution does have teeth and whether Padilla is a loaded weapon of al Qaeda would appear to be a fact question. A hearing, as ordered by the district court, would have settled the matter.
 
 
 155
 The majority suggests, however, that the President's actions are ultra vires because "the Joint Resolution does not specifically authorize detentions." Maj. at 719, 722-23. To read the resolution as the majority suggests would create a false distinction between the use of force and the ability to detain. It would be curious if the resolution authorized the interdiction and shooting of an al Qaeda operative but not the detention of that person.
 
 
 156
 The majority contends that 18 U.S.C. § 4001(a) prohibits detention of U.S. citizens on U.S. soil as enemy combatants absent a precise and specific statutory authorization from Congress. They offer a detailed history of the statute's enactment, which effectuated a repeal of the Emergency Detention Act of 1950, former 50 U.S.C. §§ 811-26 (1970). I share their view that the plain language of the statute appears to apply to military and civil detentions and that its placement in the U.S.Code does not rebut that conclusion. See Maj. at 720-21.[8] However, I find it somewhat puzzling that despite the statute's obvious and conceded clarity, the majority, based solely on the statement of one Member of Congress, see Maj. at 720, sees fit to add a condition not found in the words of the section. The statute is quite clear: "No citizen shall be imprisoned or otherwise detained by the United States except pursuant to an Act of Congress." 18 U.S.C. § 4001(a). The section neither defines an "Act of Congress" nor contains a requirement that the authorizing enactment use the word "detention." The majority does not contest that the Joint Resolution is an Act of Congress. However, they chafe at its lack of specificity. As noted above, I think it would be quite difficult to conclude that Congress did not envision that detaining a terrorist was a possibility. It is apparent from the legislative record of § 4001(a) and the Joint Resolution that the efforts of Congress in each instance meant and implied many different things to individual Members. That is not unusual. It would be quite a surprise to see that Congress was of one mind on any issue; that is the nature of a representative democracy. But one thing is clear, both enactments have the force of law. It is the words used, not the individual motives of legislators, that should serve as the guide. Thus, I think it best to trace a course of legislative intent using the plain and powerful language employed.
 
 
 157
 The problem with the majority's view of the Joint Resolution of September 18, 2001 is that it reduces the legislative efforts contained therein to a general policy statement notwithstanding the resolution's declaration invoking the War Powers Resolution of 1973. Following the events of 9-11 the President declared a national emergency, 66 Fed.Reg. 48199 (2001), thus triggering the President's war powers authority under The War Powers Resolution. See 50 U.S.C. 1541(c)(3). Nothing in the War Powers Resolution of 1973 constrains the President's utilization of his war powers.[9] Congress passed the Joint Resolution and agreed that the President should utilize his war powers with regard to an identified threat. Of course, identifying the threat made sense. Only days earlier the nation had been attacked — American lives had been lost on American soil. Congress responded and invested the President with authority to pursue those responsible for the attacks in order to prevent future attacks.[10] Contrary to the implication of the majority, the Joint Resolution was not limited in geographic scope. It did not limit the President's authority to foreign theaters. Congress clearly recognized that the events of 9-11 signaled a war with al Qaeda that could be waged on U.S. soil.
 
 
 158
 The President's authority to detain an enemy combatant in wartime is undiminished by the individual's U.S. citizenship. Quirin, 317 U.S. at 37-38, 63 S.Ct. 1; see also Hamdi v. Rumsfeld, 296 F.3d 278, 281-83 (4th Cir.2002). Consequently, Padilla's citizenship here is irrelevant. Moreover, the fact that he was captured on U.S. soil is a distinction without a difference. While Mr. Padilla's conduct may have been criminal, it was well within the threat identified in the Joint Resolution. The resolution recognizes the painful reality of 9-11; it seeks to protect U.S. citizens from terrorist attacks at home and abroad. "[E]ntry upon our territory in time of war by enemy belligerents, including those acting under the direction of armed forces of the enemy ... is a warlike act." Quirin, 317 U.S. at 36-37, 63 S.Ct. 1.[11]
 
 
 159
 Congress presumably was aware of § 4001(a) when it passed the Joint Resolution. See Goodyear Atomic Corp. v. Miller, 486 U.S. 174, 184, 108 S.Ct. 1704, 100 L.Ed.2d 158 (1988). The resolution was congressional confirmation that the nation was in crisis. Congress called upon the President to utilize his Article II war powers to deal with the emergency. By authorizing the President to use necessary and appropriate force against al Qaeda and its operatives, Congress had to know the President might detain someone who fell within the categories of identified belligerents in carrying out his charge. A different view requires a strained reading of the plain language of the resolution and cabins the theater of the President's powers as Commander in Chief to foreign soil. If that was the intent of Congress it was masked by the strong and direct language of the Joint Resolution. And if, as the majority asserts, § 4001(a) is an impenetrable barrier to the President detaining a U.S. citizen who is alleged to have ties to the belligerent and who is part of a plan for belligerency on U.S. soil, then § 4001(a), in my view, is unconstitutional.
 
 
 160
 Sadly, the majority's resolution of this matter fails to address the real weakness of the government's appeal. Padilla presses to have his day in court to rebut the government's factual assertions that he falls within the authority of the Joint Resolution. The government contends that Mr. Padilla can be held incommunicado for 18 months with no serious opportunity to put the government to its proof by an appropriate standard. The government fears that to do otherwise would compromise its ability both to gather important information from Mr. Padilla and to prevent him from communicating with other al Qaeda operatives in the United States.
 
 
 161
 While those concerns may be valid, they cannot withstand the force of another clause of the Constitution on which all three of us could surely agree. No one has suspended the Great Writ. See U.S. CONST. art. I, § 9, cl. 2. Padilla's right to pursue a remedy through the writ would be meaningless if he had to do so alone. I therefore would extend to him the right to counsel as Chief Judge Mukasey did. See Padilla, 233 F.Supp.2d at 599-609. At the hearing, Padilla, assisted by counsel, would be able to contest whether he is actually an enemy combatant thereby falling within the President's constitutional and statutory authority.
 
 
 162
 One of the more troubling aspects of Mr. Padilla's detention is that it is undefined by statute or Presidential Order. Compare Quirin, 317 U.S. at 26-28, 35, 63 S.Ct. 1 (citing former 10 U.S.C. §§ 1553 and 1554 (1940)), with 66 Fed.Reg. 57833 (2001). Certainly, a court could inquire whether Padilla continues to possess information that was helpful to the President in prosecuting the war against al Qaeda. Presumably, if he does not, the President would be required to charge Padilla criminally or delineate the appropriate process by which Padilla would remain under the President's control. See, e.g., Zadvydas v. Davis, 533 U.S. 678, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001).
 
 
 163
 Mr. Padilla's case reveals the unique dynamics of our constitutional government. Padilla is alleged to be a member of an organization that most Americans view with anger and distrust. Yet his legal claims receive careful and thoughtful attention and are examined not in the light of his cause — whatever it may be — but by the constitutional and statutory validity of the powers invoked against him. See Youngstown, 343 U.S. at 623, 72 S.Ct. 863 (Jackson, J., concurring).
 
 
 
 Notes:
 
 
 [1]
 I concur in the majority's analysis that Newman can serve as Padilla's next friend, that Secretary Rumsfeld is an appropriate respondent and that the district court had personal jurisdiction over the Secretary
 
 
 [2]
 Quirin spoke to the issue of Presidential authority as well. In that case, the Court found the President's decision to try the saboteurs before a military tribunal rested in part on an exercise of his Presidential authority under Article II of the Constitution. See Quirin, 317 U.S. at 28, 63 S.Ct. 1.
 
 
 [3]
 Of course, the majority must delineate the President's war powers as Commander in Chief; if the President acted within his inherent authority, the scope of the Joint Resolution and the proscription of § 4001(a) is irrelevant
 
 
 [4]
 The Joint Resolution also provides, in section 2(b)(1), that it is "intended to constitute specific statutory authorization within the meaning of section 5(b) of the War Powers Resolution." Pub.L. No. 107-40 § 2(b)(1), 115 Stat. 224, 224. As noted by Chief Judge Mukasey, 233 F.Supp.2d at 571 n. 3, the War Powers Resolution was enacted in 1973 over Presidential veto, and purported to limit the President's authority and discretion to commit American troops to actual or potential hostilities without specific congressional authorization. Pub.L. No. 93-148, 87 Stat. 555 (1973) (codified at 50 U.S.C. §§ 1541 et seq.). Although President Bush signed the Joint Resolution the day it was passed, he did so noting "the longstanding position of the executive branch regarding the President's constitutional authority to use force, including the Armed Forces of the United States and regarding the Constitutionality of the War Powers Resolution." Press Release, Office of the Press Secretary, President Signs Authorization for Use of Military Force Bill (Sept. 18, 2001) (statement by the President),available at http://www.whitehouse.gov/news/releases/2001/09 20010918-10.html.
 
 
 [5]
 The majority confirms that "the government had ample cause to suspect Padilla of involvement in a terrorist plot." Maj. at 699 n. 2
 
 
 [6]
 Compare the language of the Joint Resolution,supra at 722, with that of the Emergency Detention Act of 1950, former 50 U.S.C. §§ 811-26 (1970), which authorized the President to detain:
 persons who there is reasonable ground to believe probably will commit or conspire with others to commit espionage or sabotage..., in a time of internal security emergency, essential to the common defense and to the safety and security of the territory, the people and the Constitution of the United States.
 Id. at § 811(14).
 
 
 [7]
 In fact, some in Congress were concerned the "organization" prong of the Joint Resolution was too limited in its scope. They felt the Joint Resolution, as enacted, unnecessarily limited the President's ability to act against terrorist organizations such as Hamas, Hezbollah and Islamic JihadSee, e.g., 147 Cong. Rec. H5638, 5643 (2001) (statement of Representative Berman).
 
 
 [8]
 I also concur with my colleagues' rejection of the Secretary's argument that 10 U.S.C. § 956(5) constitutes an Act of Congress authorizing detentions such as Padilla's
 
 
 [9]
 Although the President may view the War Powers Resolution as an unconstitutional infringement on his constitutional authority to deal with belligerents, that fight need not be won here
 
 
 [10]
 The majority concludes that Mr. Padilla's detention as a material witness "neutralized" the threat he presentedSee Maj. at 700, 718 n. 27. This of course overlooks a significant aspect of the President's Order of June 9, 2002. Padilla was not only a threat with regard to a specific terrorist plot, see Maj. at 699 n. 2, he allegedly possesses information that could assist the United States in thwarting other terrorists plots in the U.S. and abroad.
 
 
 [11]
 Under the Geneva Convention Relative to the Treatment of Prisoners of War, Aug. 12, 1949, art. 4(A)(4), 6 U.S.T. 3317, 75 U.N.T.S. 135, prisoners of war subject to capture include all "persons who accompany the armed forces without actually being members thereof."